In The
Court of Appeals
For The
First District of Texas




NO. 01-00-00451-CV




KINGS PARK APARTMENTS, LTD.; JUDWIN PROPERTIES, INC.; AND
MARVIN ISGUR, AS INDEPENDENT CO-EXECUTOR OF THE ESTATE OF
EUGENE WINOGRAD, M.D., Appellants

V.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA, SEPARATELY AND D/B/A AMERICAN INTERNATIONAL
GROUP; AMERICAN INTERNATIONAL GROUP, INC.; AMERICAN
INTERNATIONAL ADJUSTMENT COMPANY; AND AMERICAN HOME
ASSURANCE COMPANY, Appellees

and

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA, SEPARATELY AND D/B/A AMERICAN INTERNATIONAL
GROUP; AMERICAN INTERNATIONAL GROUP, INC.; AMERICAN
INTERNATIONAL ADJUSTMENT COMPANY; AND AMERICAN HOME
ASSURANCE COMPANY, Appellants

V.

KINGS PARK APARTMENTS, LTD.; JUDWIN PROPERTIES, INC.; AND
MARVIN ISGUR, AS INDEPENDENT CO-EXECUTOR OF THE ESTATE OF
EUGENE WINOGRAD, M.D., Appellees




On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 9230066




O P I N I O N

          Kings Park Apartments, Ltd.; Judwin Properties, Inc.; and Marvin Isgur, as
independent co-executor of the estate of Eugene Winograd, M.D. (collectively “Kings
Park”) sued its insurers, National Union Fire Insurance Company of Pittsburgh,
Pennsylvania, separately and d/b/a American International Group; American
International Group, Inc.; American International Adjustment Company; and
American Home Assurance Company (collectively “National Union”), for
misappropriating a $5 million insurance policy and for wrongfully refusing to defend
Kings Park. On April 11, 2000, almost five years after the jury verdict, the trial court
rendered judgment, awarding Kings Park $500,000 in actual damages, $1 million in
exemplary damages, and $500,000 attorney’s fees. Both parties appeal. We reverse
the judgment of the trial court and render judgment that Kings Park take nothing. We
affirm the trial court’s sanctions order. 
 
FACTS
1.       The Parties
          Kings Park Apartments, Ltd. owns the Kings Park Apartments, which are
managed by Judwin. Until his death, Dr. Eugene Winograd was the general partner
of Kings Park Apartments, Ltd. and the president of Judwin. Marvin Isgur is the
independent co-executor of the estate of Dr. Winograd. We will generally refer to all
of these parties collectively as Kings Park, but will differentiate when necessary.
          Through a series of complicated business transactions, the Kings Park parties
were insured by National Union Fire Insurance Company of Pittsburgh, Pennsylvania,
separately and d/b/a American International Group; American International Group,
Inc.; American International Adjustment Company; and American Home Assurance
Company. We will refer to these parties collectively as National Union. National
Union issued a $5 million excess liability policy under which Kings Park was an
additional, unnamed insured.
2.       The Chlordane Spraying
          In April 1987, Judwin, as manager of the Kings Park Apartments, treated the
property for termites by spraying the chemical chlordane. Chlordane had been the
subject of much controversy and federal regulation. 
 
3.       Cordova: The Personal Injury Lawsuits
          In July 1987, approximately 300 plaintiffs sued Kings Park and other
defendants, seeking more than $100 million for health problems allegedly caused by 
the chlordane exposure. This case was styled “Cordova” for the lead plaintiff. 
Cordova v. Kings Park Apartments, Ltd., No. 87-28345 (157th Dist. Ct., Harris
County, Tex.) (“Cordova”).
          The claims asserted against Kings Park were covered by a line of liability
insurance totaling $16 million, which consisted of a $1 million primary policy with
Aetna, a $5 million excess policy with National Union (the policy at issue in this
case), and a $10 million final layer with Chubb. Judwin had $6 million additional,
separate coverage with U.S. Fire. Aetna, Kings Park’s primary insurer, defended the
case under a reservation of rights.
4.       The Kings Park Settlement With the Cordova Plaintiffs
          On May 4, 1990, immediately before the Cordova case was scheduled to go to
trial, Kings Park executed a settlement agreement with the chlordane plaintiffs (the
“Kings Park Settlement Agreement”), under which:
•Kings Park agreed not to contest liability in the plaintiffs’
chlordane exposure case;
 
•Kings Park assigned to the plaintiffs any extra-contractual claims
Kings Park had against its insurers, including those claims based
on bad faith or statutory claims;
 
•Kings Park obtained a limited covenant not to execute from the
plaintiffs; and
 
•Kings Park retained a percentage interest in any recovery the
plaintiffs received from the insurance companies.
          Under this settlement, the Cordova plaintiffs signed a covenant not to execute
against Kings Park in exchange for an assignment of Kings Park’s bad faith claims
against its insurers, including National Union. The plaintiffs specifically retained the
right to enforce against the insurers any judgment they obtained against Kings Park.
In addition, Kings Park retained a monetary interest in the outcome of the bad faith
lawsuits (the “proceeds participation”).



4.       The Flores I Trial
          In June 1990, the trial court severed the claims of 10 Cordova plaintiffs,
including three Kings Park apartment residents, into a test case styled Flores I. 
Ismael Flores, Jr. v. Kings Park Apartments, Ltd., No. 82-28345-B (157th Dist. Ct.,
Harris County, Tex.) (“Flores I”). All parties waived a jury, and Kings Park, the
defendant, rested without putting on any evidence. The trial court found that Kings
Park was negligent and awarded the plaintiffs $10.5 million. The judgment awarded
approximately $1 million per plaintiff; therefore, the three Kings Park residents
received a combined judgment for over $3 million. 
5.       Flores II: The Bad Faith Litigation
          Armed with the Flores I judgment, the plaintiffs proceeded to file suit against
various Kings Park insurers, including National Union. This suit, styled Flores II,
related to the bad faith claims that Kings Park had previously assigned to the
plaintiffs in the Kings Park Settlement Agreement. Flores v. Truck Ins. Exch., No.
91-01595 (157th Dist. Ct., Harris County, Tex.) (Flores II).


 The petition claimed
that the insurers had failed to provide an unqualified defense and had failed to settle
the claims within their policy limits.
          After the Kings Park Settlement, Kings Park’s interests had become aligned
with the Cordova plaintiffs. National Union asserts that Kings Park had “rolled over”
in Flores I so that the chlordane plaintiffs could obtain a large judgment, which
would enhance the value of Kings Park’s proceeds participation. Therefore, it was
in Kings Park’s best interest for the plaintiffs to recover the greatest amount possible
from the insurance companies. Because Kings Park, the tortfeasor, did not have to
pay any money to the plaintiffs, National Union refers to the Kings Park settlement
as a “sweetheart deal” for Kings Park.
6.       The National Union Settlement of Flores II
          On July 2, 1992, less than a week before the trial setting, National Union and
the Flores II plaintiffs entered into a settlement agreement, whereby National Union
would pay the plaintiffs the full $5 million policy limits (the National Union
Settlement Agreement). The settlement provided a covenant not to execute in favor
of Kings Park. 
          National Union’s plan in making the settlement agreement was to copy a
similar agreement that had been used successfully by U.S. Fire, another Judwin
insurer, to exhaust its policy limits. U.S. Fire had paid its $6 million policy limits to
the plaintiffs in return for a covenant not to execute against Kings Park. Kings Park
challenged U.S. Fire’s settlement in separate litigation, which was ultimately resolved
in favor of U.S. Fire. Judwin Props., Inc. v. United States Fire Ins. Co., 973 F.2d 432
(5th Cir. 1992). This federal case will be referred to as Judwin I. 
          The trial court rendered judgment, which approved the settlement payment
allocation according to the plaintiffs’ medical monitoring needs. Based on the
proceeds participation that Kings Park had previously negotiated in the Kings Park
Settlement Agreement with the plaintiffs, Kings Park received $2.4 million of the $5
million that National Union paid in settlement to those plaintiffs. 
7.       Kings Park sued National Union
          Kings Park initiated the underlying lawsuit against National Union for
misappropriating the $5 million policy proceeds and for wrongfully refusing to
defend or indemnify Kings Park. Kings Park also sued for conversion, conspiracy,
malicious breach of contract, negligence, gross negligence, DTPA violations,
Insurance Code violations, intentional infliction of emotional distress, fraud,
misrepresentation, and unjust enrichment. 
          Kings Park alleged that National Union had paid the $5 million solely to
resolve National Union’s own bad faith claims, instead of resolving the claims against
Kings Park. In response, National Union argued that the $5 million settled the bodily
injury claims against Kings Park; therefore, the payment could not be the basis for
liability under any theory because the payment exhausted the policy limits.
          After a two-week trial, the jury found for Kings Park on breach of contract, bad
faith, unjust enrichment, constructive fraud, and Insurance Code theories, but failed
to find conversion, DTPA, malice, or a flagrant disregard of Kings Park’s rights. The
jury found the following damages: (1) zero actual damages for loss of the indemnity
rights under the policy; (2) $500,000 actual damages for loss of the defense
obligation; (3) $10 million additional damages; and (4) $500,000 attorney’s fees. 
          On April 11, 2000, almost five years after the verdict, the trial court signed a
final judgment that: (1) awarded Kings Park $500,000 actual damages; (2) reduced
the additional damages from $10 million to $1 million; and (3) awarded Kings Park
$500,000 attorney’s fees as found by the jury. Both parties appeal the judgment.
          After the jury verdict, but before the trial court rendered judgment, Kings Park
alleged that National Union and its counsel had engaged in discovery abuse and other
misconduct. On April 20, 2000, after more than five years and numerous sanctions
hearings, the trial court issued a sanctions order against National Union. Kings Park
also appeals the sanctions order.
          Set forth below, we will address: (1) National Union’s appeal of the judgment;
(2) Kings Park’s appeal of the judgment; and (3) Kings Park’s motion to supplement
the record and its appeal of the sanctions order.
I. NATIONAL UNION’S APPEAL OF THE JUDGMENT
Exhaustion of Policy Limits:
Breach of Contract and Duty to Defend Claims

          National Union argues that it paid the $5 million to settle its own bad faith
claims and the bodily injury claims against Kings Park; therefore, it exhausted the
policy limits and is not liable to Kings Park for its duty to indemnify or duty to
defend. In contrast, Kings Park argues that National Union paid the $5 million to
settle National Union’s own bad faith claims, not the bodily injury claims against
Kings Park. Kings Park contends that it did not receive any benefits when National
Union used Kings Park’s money. 
          Points of error one, two, and nine relate to National Union’s argument that it
is not liable for breach of contract because its payment exhausted policy limits. In
point of error one, National Union contends that the evidence is legally or factually
insufficient to support the finding that the payment was a breach of contract. In point
of error two, National Union contends that its exhaustion of the policy was not
actionable, based on the finding that the bodily injury claims were at least $5 million. 
In point of error nine, National Union contends that the exhaustion of policy limits
concluded its obligations not only to Judwin, but also to Kings Park and Winograd,
because under Texas law, an insurer may pay claims, and even exhaust the limits, on
behalf of one insured without incurring any liability to the other insureds.
          Generally, under a liability insurance contract, the insurer has the obligation
to indemnify and the obligation to defend. The indemnity obligation requires the
insurer to pay on the insured’s behalf amounts that the insured becomes legally
obligated to pay. The obligation to defend requires the insurer to defend any suit
against the insured, “even if such suit is groundless, false, or fraudulent.” National
Union claims that such a provision gives National Union the right to settle claims
whenever settlement is “deemed expedient” by National Union. 
          The Flores I judgment required that Judwin pay three Kings Park’s claimants
$3 million for bodily injury claims covered by the insurance policy. Additionally,
trial was approaching on the other 113 Cordova claimants. National Union argues
that it paid the full $5 million policy limits to those claimants on behalf of the
insureds; therefore, its performance of the contract obligation is not a breach of that
contract. Further, National Union contends that it properly exhausted its policy limits
when it made the $5 million payment under Soriano, which holds that an insurance
company may exhaust its limits by making a reasonable settlement of any covered
claim without incurring liability to the insured because other claims remain. Tex.
Farmers Ins. Co. v. Soriano, 881 S.W.2d 312 (Tex. 1994).
          In support of its contention that it exhausted policy limits on behalf of Kings
Park to settle the chlordane plaintiffs’ bodily injury claims, National Union relies on:
(1) the National Union Settlement Agreement; (2) the August 8, 1992 Flores II
judgment; (3) the payment by Chubb; and (4) the Judwin I case.
          1. The National Union Settlement Agreement
          National Union’s Settlement Agreement with the chlordane plaintiffs is
evidence that National Union exhausted policy limits. In the “Covenant Not to
Execute” (paragraph 2 of the agreement), National Union agreed to pay $5 million
in exchange for the chlordane plaintiffs’ promise not to execute any judgment on any
“Claims,” including the bodily injury claims, against the Kings Park parties. 
8.Covenant Not to Execute. In consideration of a payment by
[National Union] on behalf of the [Cordova and Flores I]
“Defendants” of Five Million Dollars ($5,000,000). . . [the
chlordane plaintiffs] and each of them, jointly and severally,
promise, covenant and agree. . . that they shall not seek to execute
any judgment on any “Claims”. . . . 
The term “Defendants” included Judwin, Winograd, Kings Park, and National Union. 
The term “Claims” was defined as “any claim, demand, suit or cause of action, past
present, or future, known or unknown” “arising from or in any way connected to
Cordova, Flores I, or Flores II. Accordingly, the term “Claims” included the bodily
injury claims against Kings Park.
          In the “Release of Bad Faith Claims” (paragraph 3 of the agreement), National 
Union agreed to pay a “peppercorn”


 in exchange for the chlordane plaintiffs’ release
of the bad faith claims against National Union: 
9.Release of Bad Faith Claims. In return for a peppercorn and other
good and valuable consideration . . . [the chlordane plaintiffs] and
each of them, jointly and severally RELEASE AND FOREVER
DISCHARGE [National Union] from any claim, demand, suit or
cause of action they now have or may hereafter acquire in law or
equity, by statute or regulation, known or unknown, arising out of
or in any way connected with [National Union’s] alleged acts or
omissions in connection with the “Claims” or the manner in
which they were handled and [the chlordane plaintiffs], each of
them, jointly and severally, agree to dismiss, with prejudice,
[National Union] from [Flores II]. 
          2. The August 8, 1992 Judgment
          On August 8, 1992, the trial court signed the Flores II judgment approving the
National Union Settlement Agreement. The judgment set forth an allocation of
payments according to the plaintiffs’ medical monitoring needs. It did not allocate
any damages for the bad faith claims. The trial court found that the amounts were
“within the range of actual compensatory damages claimed by the Minor Plaintiffs
as a result of their injuries.” This is further evidence that National Union’s payment
was for the bodily injury claims. 
          Kings Park argues that the judgment supports its contention that National
Union’s payment was for bad faith, not bodily injury claims. It points to the portion
of the judgment which stated that plaintiffs retain all claims against Winograd and
Judwin arising out of the alleged misapplication of chlordane at the Kings Park
Apartments.


 Kings Park argues that, because plaintiffs specifically retained the
bodily injury claims, it is only logical that the bad faith claims against National Union
were dismissed with prejudice. 
          There is evidence in the record that the bodily injury claims were not formally
released after National Union settled, specifically so that the plaintiffs could collect
from Chubb, the next level insurer. On August 3, 1992, the chlordane plaintiffs’
attorney wrote a letter to National Union’s attorney regarding a draft of the proposed
judgment, which stated:
[W]e cannot include language suggesting that all claims, demands, and
causes of action against the National Union Insureds have been
compromised and settled. As you know, we still retain claims against
the Chubb Group of Companies. We cannot provide for the dismissal
of all claims and causes of action against Judwin and Dr. Winograd until
the claims against Chubb have been resolved. In this regard, our
settlement agreement provides only, in paragraph 2, that we will not
“seek to execute any judgment” against the National Union Insureds.
          The record supports that the settlement agreement did not dismiss the
plaintiffs’ bodily injury claims against Kings Park because the plaintiffs wanted to
pursue their claims against Chubb. The plaintiffs had to have “live” claims in order
to recover. Thus, the fact that the settlement agreement did not dismiss the bodily
injury claims is not dispositive in this case.
          3. Payment by Chubb
          After the National Union Settlement Agreement, the next level insurer, Chubb,
offered to defend Judwin based on its understanding that National Union had
“tendered its policy limits in the Cordova case.” There is evidence in the record that
Kings Park sought and obtained coverage from Chubb, which would not have been
available without an exhaustion of National Union’s policy. 
          4. The Judwin I Case
          U.S. Fire, another Judwin insurer, executed a similar agreement when it paid
$6 million to the chlordane plaintiffs in return for a covenant not to execute against
Kings Park, and a peppercorn for a release of the bad faith claims. Kings Park
challenged the settlement in separate litigation, which was ultimately resolved in
favor of U.S. Fire as a matter of law. In Judwin I, the Fifth Circuit rendered summary
judgment for U.S. Fire, holding that U.S. Fire had exhausted its policy limits. Judwin
Props., Inc. v. United States Fire Ins. Co., 973 F.2d 432 (5th Cir. 1992).
          In point of error thirteen, National Union contends that the judgment in Judwin
I, which held that Judwin take nothing, precludes Kings Park’s claims under 
collateral estoppel and issue preclusion. See Restatement (Second) of Judgments
§ 27 cmt. c (1981). We disagree, recognizing that the National Union and U.S. Fire
agreements are not identical. Clearly, the insurance companies and their payment
amounts are different. Another difference is that National Union’s definition of
“Claims” included Flores II, while U.S. Fire’s did not. Indeed, Flores II had not yet
been filed at the time the U.S. Fire agreement was drafted. This latter detail,
however, is a difference without a distinction. In both the U.S. Fire and National
Union agreements, the definition of “Claims” included the bad faith claims against
the respective insurance companies. 
          Because the agreements are not identical in all respects, we are not bound by
the judgment in Judwin I. We overrule National Union’s point of error thirteen and
hold that collateral estoppel and issue preclusion do not preclude Kings Park’s
recovery. However, we will follow the reasoning set forth in the Fifth Circuit’s
opinion as further support that National Union exhausted its policy limits. See
Judwin, 973 F.2d at 435-36. In accordance with Judwin I, we hold that National
Union paid a peppercorn to the chlordane plaintiffs to extinguish the bad faith claims
against National Union and $5 million on behalf of Kings Park to settle the bodily
injury claims against Kings Park. See id.
          We follow the reasoning of the Fifth Circuit in the Judwin I case. Additionally,
we base our decision on: (1) the National Union Settlement Agreement; (2) the
August 8, 1992 Flores II judgment; and (3) the payment by Chubb. We conclude that
the evidence is legally sufficient to prove that National Union’s $5 million payment
exhausted its policy limits on behalf of Kings Park to settle the chlordane plaintiffs
bodily injury claims.
          We sustain points of error one, two, and nine.
          We overrule point of error thirteen.
Benefit to Kings Park
          Notwithstanding the recitations in the National Union Settlement
Agreement—that National Union paid $5 million in consideration for the plaintiffs’
covenant not to execute any judgment on any claims, including the bodily injury
claims against the Kings Park parties—Kings Park argues that the $5 million payment
was actually in consideration for the bad faith claims against National Union, not the
bodily injury claims against Kings Park. Kings Park contends that it received no
benefit from National Union’s settlement payment, as evidenced by the portion of the
August 8, 1992 Flores II judgment, which stated that plaintiffs specifically retain all
claims against Winograd and Judwin arising out of the alleged misapplication of
chlordane at the Kings Park Apartments. 
          In response, National Union argues that Kings Park received several benefits
from the settlement agreement, first citing the benefit of the plaintiffs’ covenant not
to execute against Kings Park. Kings Park, however, responds that it received no
benefit from this covenant not to execute because Kings Park had already obtained
its own covenant not to execute in the Kings Park Settlement Agreement, and U.S.
Fire had secured one in the U.S. Fire Settlement.
          Even if the covenant not to execute was redundant, we agree with National
Union that Kings Park received other benefits from the National Union Settlement
Agreement. For example, it received $2.4 million in proceeds participation out of the
$5 million National Union paid. National Union paid the settlement money into the
trial court registry. The funds were then disbursed pursuant to a judgment allocating
the money to the chlordane claimants based on medical monitoring costs. Judwin
signed its agreement to that judgment for itself and Winograd. Judwin, Kings Park,
and Winograd received nearly half of National Union’s payment under an
arrangement with the chlordane claimants. 
          Additionally, as set forth above, Kings Park received the benefit of the right to
proceed to Chubb, the next layer of insurance, which would not have been available
absent exhaustion of National Union’s policy. Moreover, Kings Park received the
benefit of an essential step toward a full release after all the insurers paid. National
Union’s $5 million payment was an integral piece of the ultimate settlement plan to
a full release of judgment. This is evidenced by the Kings Park Settlement
Agreement, which stated that Kings Park assigned its bad faith claims to the
chlordane plaintiffs, and that the chlordane plaintiffs would execute a release of
judgment in favor of Kings Park upon completion of the litigation against Kings
Park’s insurers. 
Upon execution of this agreement and upon completion of the litigation
against [Kings Park’s] insurance carriers, a Release of Judgement [sic]
will be executed and filed by [the chlordane plaintiffs] in favor of all
[Kings Park] Defendants. The Release of Judgment will fully and
completely release all [Kings Park] defendants from all liability arising
under this case. 
          Thus, the National Union Settlement Agreement gave Kings Park the benefits
of the $2.4 million proceeds participation, the right to proceed against Chubb, and an
essential step toward a full release of judgment. Tort Claims
          In point of error ten, National Union contends that Kings Park cannot recover
on the tort claims it had against National Union because Kings Park assigned those
claims to the chlordane plaintiffs, who then released those claims in a settlement with
National Union. Therefore, National Union argues, Kings Park cannot recover on
claims it does not own and which have been released.
          Kings Park assigned its tort causes of action against National Union to the
chlordane plaintiffs. The Kings Park Settlement Agreement recited:
As a part of the consideration included in the release and settlement
agreement between all plaintiffs and their attorneys, and defendants, [the
Kings Park parties] for good and valuable consideration, including the
release by plaintiffs of their claims and causes of action against
defendants, defendants hereby ASSIGN, CONVEY, SELL,
TRANSFER, and DELIVER to [chlordane] plaintiffs and their attorneys
. . . all of defendants’ causes of action against any of their insurance
carriers, including but not limited to [National Union] . . . based upon
bad faith and any violations by the insurance carriers of the Texas
Insurance Code only in the two referenced lawsuits [Cordova and Flores
I]. It is specifically understood that the Defendants are not assigning to
the Plaintiffs any claim(s) for coverage or a legal defense from any of
the insurance carriers herein, but rather, are only assigning those claims
and/or causes of action arising from the insurance companies’ actions
and omissions in the two referenced law suits. The Defendants
specifically retain all causes of actions, claims and rights against any
insurance carrier for insurance coverage and a right to a legal defense in
the two referenced lawsuits and with respect to any other claim or
lawsuit.
          According to this agreement, Kings Park assigned to the chlordane plaintiffs
its claims against National Union based upon bad faith and Insurance Code violations
arising from National Union’s actions and omissions in Cordova and Flores I. The
plaintiffs released all of those claims against National Union in the National Union
Settlement Agreement. Kings Park contends that the claims it had assigned to the
plaintiffs are different from its claims against National Union in this lawsuit. The
assigned claims were based upon National Union’s failure to defend and indemnify
only in Cordova and Flores I. In contrast, its claims in this lawsuit were based upon
National Union’s misappropriation of Kings Park’s policy proceeds to settle Flores
II. 
          In an unpublished opinion, the Fifth Circuit addressed this issue in another
case, holding that Judwin could not recover on its tort claims against U.S. Fire as a
matter of law because it had previously assigned those claims to the plaintiffs. 
Judwin Props., Inc. v. United States Fire Ins. Co., No. 93-2462 (5th Cir. July 22,
1994) (not designated for publication). This case will be referred to as Judwin II. 
Judwin’s argument in Judwin II was similar to Kings Park’s argument in this case: 
that its current bad faith claims had not been assigned because they arose “from other
chlordane lawsuits,” after the Cordova/Flores actions. Id. at *5. Judwin argued that
U.S. Fire acted in bad faith by settling with the Cordova and Flores plaintiffs, when
there were “literally hundreds of remaining plaintiffs.” Id. at *3. 
          The Fifth Circuit relied on the Soriano case from the Texas Supreme Court,
which held that an insurance company may exhaust its limits by making a reasonable
settlement of any covered claim without incurring liability to the insured because
other claims remain. Id. at *9-10 (citing Soriano, 881 S.W.2d 312). The Fifth Circuit
concluded, “Any bad faith claim thus might turn on the acts that Judwin alleged on
the part of USF that left Judwin exposed for substantially more than the policies’
limits—the very ‘acts or omissions’ assigned by Judwin” to the chlordane plaintiffs. 
Id. at *9. The court further held that Judwin’s claim was a “cause of action arising
from the insurance companies’ actions and omissions in the Flores and Cordova
actions—the very claim assigned to the Flores and Cordova plaintiffs.” Id. at *8 n.7. 
          We recognize that Judwin II is not binding precedent in this case; nonetheless,
we are persuaded by the Fifth Circuit’s reasoning. We hold that Kings Park cannot
recover on the tort claims against National Union, as a matter of law, because those
claims had been assigned to the chlordane plaintiffs. 
          Moreover, as set forth above, we hold that National Union’s $5 million
payment exhausted its policy limits on behalf of Kings Park to settle the chlordane
plaintiffs bodily injury claims. Because the policy had been exhausted, bad faith and
Insurance Code violations could not have arisen from National Union’s failure to
defend and settle future lawsuits. See Soriano, 881 S.W.2d 312. Accordingly, we
hold that Kings Park cannot recover on its tort claims as a matter of law.
          We sustain point of error ten.
National Union’s Remaining IssuesIn point of error seven, National Union contends that the evidence is legally or
factually insufficient to support the finding of unjust enrichment. In Question 10A,
the jury found that National Union was unjustly enriched by paying the $5 million. 
However, Question 16, the damages question, did not submit a damage question
about unjust enrichment. Instead, Question 16 related to breach of contract,
Insurance Code, constructive fraud, and bad faith. Because unjust enrichment
damages were not submitted to the jury, we need not address point of error seven
regarding whether the evidence is sufficient to support the liability finding.
          Points of error three and six relate to National Union’s argument that Kings
Park’s claims sound in contract, not tort. In point of error three, National Union
contends that it is not liable under the tort theories of bad faith, constructive fraud,
Insurance Code violations, and unjust enrichment, because the settlement was
permitted by the insurance contract. In point of error six, National Union contends
that the evidence is legally or factually insufficient to support the findings on the
common law claims of bad faith, unjust enrichment, or constructive fraud, because
Stowers is the only common law tort duty in the liability insurance context. Md. Ins.
Co. v. Head Indus. Coatings, 938 S.W.2d 27 (Tex. 1996). 
          Points of error four and five relate to the Insurance Code. In point of error
four, National Union contends that the evidence is legally or factually insufficient to
support the findings of an Insurance Code violation and a knowing violation because
the Insurance Code does not apply to the handling or settlement of third-party claims
against the insured. Tex. Ins. Code Ann. art. 21.21 (Vernon Supp. 2003). In point
of error five, National Union contends that the jury instruction for the Insurance Code
was erroneous because it improperly incorporated portions of the DTPA that cannot
be a basis for Insurance Code liability. See Crown Life v. Casteel, 22 S.W.3d 378
(Tex. 1999).
          In point of error eight, National Union contends that the evidence is legally or
factually insufficient to support the finding of constructive fraud because no fiduciary
duty exists. In point of error eleven, National Union contends that, given the finding
that Judwin ratified the payment, Winograd and Kings Park likewise should be bound
by that ratification as a matter of law; therefore, the claims Judwin, Winograd, and
Kings Park are barred by doctrines of waiver and estoppel. In point of error twelve,
National Union contends that the evidence is legally or factually insufficient to
support Kings Park’s award of $500,000 actual damages for loss of defense
obligation.
          As set forth above, we hold that National Union’s $5 million payment
exhausted policy limits. There are no actual damages as a matter of law; therefore,
the awards of actual damages, additional damages, and attorney’s fees were improper. 
Because we have sustained points of error one, two, nine, and ten, we need not
address National Union’s remaining points of error and decline to do so.II. KINGS PARK’S APPEAL OF THE JUDGMENTActual Damages
          In points of error one through six, Kings Park challenges its actual damages
award, which relate to its claims of: (1) misappropriation of the indemnity benefit; (2)
unfair and deceptive insurance practices; (3) breach of contract; (4) unjust
enrichment; (5) breach of the duty of good faith and fair dealing; (6) and constructive
fraud. 
          Kings Park contends that there is no evidence to support the jury’s finding that
Kings Park suffered zero damages for the loss of the indemnity obligation; therefore,
the trial court should have disregarding that zero finding. Kings Park complains that
the court erred in failing to award Kings Park its full actual damages because the jury
made an affirmative finding on National Union’s theories of misappropriation of the
indemnity benefit, unfair and deceptive insurance practices, breach of contract, unjust
enrichment, breach of the duty of good faith and fair dealing, and constructive fraud.
          The jury charge stated as follows:
          Question No. 1. Do you find that any portion of the $5 million
paid by National Union was paid to settle claims against National Union
in the Flores II bad faith lawsuit? 
Answer: Yes
 
          Question No. 2. What part, if any, of the $5 million paid by
National Union was paid for settlement of the bad faith claims against
National Union? 
Answer: $5,000,000.00
 
          Question No. 3. Was the reasonable settlement value of the
bodily injury claims against the insureds covered by the Policy in the
Cordova/Flores I personal injury lawsuits at least $5 million in 1992? 
Answer: Yes
 
          Question No. 16. What sum of money, if any if paid now in cash
would fairly and reasonably compensate Judwin, Kings Park or
Winograd for their damages, if any?
Consider the following elements of damages, if any, and none
other.
                              1.Loss of benefits under the indemnity obligation in
the Policy; and,
                              2.Loss of benefits under the defense obligation in the
Policy.
* * * *
Under the terms of the National Union insurance policies at issue,
National Union’s duties to pay claims, defend lawsuits, or
otherwise act ended once National Union exhausted the policy
limits by payment of judgments or settlements on behalf of its
insureds.
Answer in dollars and cents, if any, for:
                              1.Loss of benefits under the indemnity obligation in
the Policy
$ 0.00
                              2.Loss of benefits under the defense obligation in the
Policy.
$ 500,000.00
          In summary, in Question 2, the jury found that National Union paid $5 million
to settle its own bad faith claims; however, in Question 16, it awarded zero damages
for loss of the indemnity obligation. Kings Park argues that this constitutes a conflict
in the jury’s answers; therefore, the jury’s $5 million answer in Question 2 should
replace the finding of zero damages in Question 16. Kings Park further argues that
this substitution is appropriate for all of its liability theories. 
          In response, National Union argues that it fulfilled its contractual obligation
to pay the bodily injury claims owed by Kings Park. National Union relies on the
jury’s finding in Question 3, which stated that the reasonable settlement value of the
bodily injury claims against Kings Park in the Cordova/Flores I personal injury
lawsuits was at least $5 million. Additionally, one of the instructions accompanying
Question 16 stated that National Union’s duty to pay claims and defend lawsuits
ended once National Union exhausted the policy limits by payment of judgments or
settlements on behalf of its insureds.
          The alleged conflict arises because, in Question 2, the jury found that National
Union paid $5 million to settle its own claims, and in Question 3, the jury found that
National Union paid $5 million to settle National Union’s bodily injury claims. 
Regardless of the jury’s affirmative findings on Kings Park’s liability theories,
Question 16 was the damages question. Questions 2 and 3 were predicate fact
questions; they were neither liability nor damage questions. 
          As set forth above in National Union’s appeal, we hold that National Union’s
$5 million payment exhausted policy limits. We conclude that National Union’s
payment was on behalf of Kings Park in settlement of the chlordane plaintiffs’ bodily
injury claims, based on: (1) the National Union Settlement Agreement; (2) the August
8, 1992 Flores II judgment; (3) the payment by Chubb; and (4) the Fifth Circuit’s
reasoning in the Judwin I case. Because the evidence is legally sufficient to support
the jury’s finding in Question 16 that Kings Park suffered zero damages for loss of
the indemnity obligation, the trial court was not required to disregard the finding in
Question 16 and substitute it with the jury’s $5 million answer to Question 2.
          We overrule points of error one through six.
Kings Park’s Remaining Issues
          In its remaining points of error seven and ten, Kings Park contends that the trial
court erred: (1) by denying all recovery to Judwin, based on the jury’s finding that
Judwin ratified National Union’s misconduct; and (2) in failing to disregard the jury’s
finding of zero damages in appellate attorney’s fees because the evidence was legally
insufficient to support the zero award.
          Again, we have held that National Union’s $5 million payment exhausted its
policy limits. We have further held that Kings Park cannot recover on its tort claims
as a matter of law. Accordingly, we need not address these remaining issues and
decline to do so. 
III. KINGS PARK’S APPEAL OF THE SANCTIONS ORDER
          After the jury verdict, but before the trial court rendered judgment, Kings Park
alleged that National Union and its counsel had engaged in massive discovery abuse
and other misconduct throughout the litigation. Kings Park represents that it was
contacted by a former secretary for National Union’s trial counsel. The secretary
claimed to have personal knowledge that National Union and its attorneys concealed
discoverable documents, filed a false affidavit, instructed a deposition witness to
remain unavailable, and instructed a paralegal to steal documents from the chambers
of the special trial judge, the Honorable Ruby Sondock. 
          On June 1, 1995, the trial court conducted an ex parte, in camera hearing to
investigate these matters. On April 20, 2000, after more than five years and
numerous sanctions hearings, the trial court issued a sanctions order concerning
National Union’s litigation abuses. The trial court issued a sanctions order under its
inherent power, finding that National Union had “caused significant interference with
the legitimate exercise of the traditional core functions of this court.” The following
sanctions were imposed against National Union: 
•National Union must implement a policy guaranteeing that (a)
every National Union litigation file which relates to a matter filed
in a Texas state court shall include a copy of the Texas Lawyers
Creed—A Mandate for Professionalism and (b) National Union
shall educate every individual with supervisory responsibility for
litigation in a Texas state court about the content of the Texas
Lawyers Creed—A Mandate for Professionalism.
 
•National Union’s Vice President must not participate in,
supervise, or handle any Texas case unless he either: (a) appears
in the 133rd District Court and explains his prior affidavit or (b)
seeks leave to participate in Texas cases from the judges
presiding over those cases.
 
•For a three-year period beginning in 2001, National Union must
sponsor twice-annual ethics courses for Texas attorneys, and is
required to pay $25,000 to the Texas Center for Legal Ethics and
Professionalism.
          Kings Park appeals the order, arguing that the sanctions against National Union
were inadequate, “toothless, and largely symbolic.” Kings Park argues that the trial
court should have sanctioned National Union under Rule of Civil Procedure 215, not
pursuant to its inherent power, and should have required National Union to pay Kings
Park half a million dollars in attorney’s fees. 
          Motion to Supplement the Record. Preliminarily, we address Kings Park’s
motion to supplement the record. Kings Park asked this Court to unseal five
envelopes, arguing that it required the information contained in the sealed documents
to adequately challenge what it characterized as an inadequate sanctions order against
National Union.


 We have unsealed and reviewed each document contained in the
five sealed envelopes. Based on our knowledge of the sealed documents, we believe
that Kings Park has had sufficient ability to contest the adequacy of the sanctions
order without reviewing the sealed documents. We will consider the sealed
documents in our assessment of the adequacy of the sanctions order. 
          On July 19, 2002, this Court issued an order that granted Kings Park’s motion
to supplement the record and denied its motion to unseal the documents.
          Justiciability. National Union contends that Kings Park does not have a
justiciable interest to appeal the sanctions order because the sanctions were not
imposed against Kings Park. After reviewing both parties’ extensive briefs on
justiciability, we have determined that Kings Park has standing to appeal the trial
court’s denial of its requested sanctions against National Union. 
          Inherent Power. Turning to the merits of the sanctions order, in point of error
eight, Kings Park contends that the trial court erred by assessing only “symbolic”
sanctions against National Union, and by failing to require National Union to pay
Kings Park’s attorney’s fees as sanctions, considering that: (a) National Union
engaged in egregious misconduct, including stealing documents from the offices of
the special trial judge; (b) the misconduct interfered with the traditional core
functions of the trial court; (c) the misconduct “adversely affected” Kings Park; and
(d) Kings Park incurred attorney’s fees of $500,000 as a result of National Union’s
misconduct. In point of error nine, Kings Park contends that the trial court erred by
failing to enter sanctions against National Union under Rule of Civil Procedure 215. 
In response, National Union argues that Kings Park is appealing the sanctions order
“to disguise the fact that its case on the merits cannot succeed.” 
          We review the trial court’s imposition of sanctions under an abuse of discretion
standard. In re Bennett, 960 S.W.2d 35, 40 (Tex. 1997). A trial court abuses its
discretion when it acts without reference to any guiding rules or principles. Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). 
          As stated in the sanctions order, the trial court found that National Union had
caused “significant interference with the legitimate exercise of the traditional core
functions of this Court.” Such a finding supports the entry of sanctions under a
court’s “inherent powers.” Eichelberger v. Eichelberger, 582 S.W.2d 395, 398-99
(Tex. 1979). Trial courts have inherent power to take action that will “aid in the
exercise of its jurisdiction, in the administration of justice, and in the preservation of
its independence and integrity.” Id. 
          In Kutch v. Del Mar College, the court of appeals refined this concept by
recognizing that the inherent power basis for sanctions is the strongest and most
powerful when the conduct complained of interferes with one of the “core functions”
of the judiciary. 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ);
see also Trevino v. Ortega, 969 S.W.2d 950, 958-59 (Tex. 1998) (Baker, J.,
concurring). The “core functions” of the judiciary include hearing evidence, deciding
issues of fact raised by the pleadings, deciding questions of law, rendering final
judgment, and enforcing that judgment. Kutch, 831 S.W.2d at 510. The Kutch court
stated:
Inherent power to sanction exists to the extent necessary to deter,
alleviate, and counteract bad faith abuse of the judicial process, such as
any significant interference with the traditional core functions of Texas
courts. Accordingly, for inherent power to apply, there must be some
evidence and factual findings that the conduct complained of
significantly interfered with the court’s legitimate exercise of one of
these powers.

831 S.W.2d at 510. Limitations do exist on a court’s inherent power. Id. The court
explained, “The amorphous nature of this power, and its potency, demands sparing
use. The best practice is to rely upon the rules and statutes expressly authorizing
sanctions whenever possible.” Id. 
          In Lawrence v. Kohl, this Court adopted the Kutch reasoning. 853 S.W.2d 697,
699 (Tex. App.—Houston [1st Dist.] 1993, no writ). In Lawrence, and subsequently
in Onwuteaka v. Gill, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995,
no writ) and in Phillips & Akers, P.C. v. Cornwell, 927 S.W.2d 276, 280 (Tex.
App.—Houston [1st Dist.] 1996, no pet.), we held that there are limits to the trial
court’s inherent power to sanction. Specifically, that power “exists only to the extent
necessary to deter, alleviate, and counteract bad faith abuse of the judicial process,
such as significant interference with core judicial functions.” Cornwell, 927 S.W.2d
at 280. 
          In Island Entertainment Inc. v. Castaneda, we again discussed Kutch, holding
that, “Texas courts have the inherent power to sanction for an abuse of the judicial
process that may not be covered by any specific rule or statute.” 882 S.W.2d 2, 5
(Tex. App.—Houston [1st Dist.] 1994, writ denied). Assessing sanctions under the
trial court’s inherent powers requires a two-step process. First, the trial court must
“rely upon the rules and statutes expressly authorizing sanctions,” and second, the
trial court, applying its inherent power to impose sanctions, must make factual
findings to determine whether there is some evidence that the conduct complained of
significantly interfered with the court’s legitimate exercise of its core functions. See
id; see also Kutch, 831 S.W.2d at 510. 
          There is some evidence in the record that the conduct complained of
significantly interfered with the court’s legitimate exercise of its core functions. For
example, the allegation that National Union instructed a paralegal to steal documents
from the chambers of the special trial judge may be viewed as a interference with the
traditional core functions of the court. Based on this allegation, therefore, the trial
court had the authority to enter sanctions under its inherent power. Moreover, Kings
Park did not object to the trial court’s decision to rely on its inherent powers; instead,
it argued that trial court erred by assessing only “symbolic” sanctions against
National Union, and by failing to require National Union to pay Kings Park’s
attorney’s fees as sanctions, considering that the misconduct interfered with the
“traditional core functions of the trial court.” Accordingly, we hold that the trial court
did not abuse its discretion in imposing sanctions under its inherent power. 
          Under rule 215, the trial court could have imposed “any appropriate sanction,”
including attorney’s fees, unless it found that “the failure was substantially justified
or that other circumstances make an award of expenses unjust.” See Tex. R. Civ. P.
215.1(d), 215.2(b), 215.3. Here, the trial court indicated, in relation to its ruling
under its inherent powers, that the circumstances made an award of attorneys fees to
Kings Park unjust. The court specifically stated why it did not award attorney’s fees: 
“This has been a very contentious case, and Kings Park’s expenditure of attorney’s
fees was self-inflicted in an attempt to gain information to use in other cases.” 
Moreover, the sanctions order stated that the trial court “considered the offensive
conduct and attempted to craft sanctions appropriate to punish that conduct.” We
believe that the trial court was in the best position to do so, especially in light of the
fact that many sanctions hearings had been held. We hold that the trial court did not
abuse its discretion in imposing the sanctions under its inherent power and in denying
attorney’s fees.
          To assess the adequacy of the sanctions order, we have reviewed the record and
considered the five envelopes filed under seal. We overrule points of error eight and
nine. The sanctions order is affirmed.
CONCLUSION
          We reverse the judgment of the trial court and render judgment that Kings Park
take nothing. We affirm the trial court’s sanctions order. Any other pending motions
are denied as moot.



                                                                                  Adele Hedges
                                                                                  Justice

Panel consists of Justices Hedges, Jennings, and Keyes.