| jiDALEY, Judge.
Plaintiff, Shirley Kaufmann, appeals a trial court judgment dated May 12, 1999, denying her claim for reimbursement against Corporate Realty, Inc., for monies she alleged defendant owed to her. The court found that plaintiff had advanced the funds to defendant, but also found that plaintiffs claim for repayment was conditional. The trial court found that plaintiff failed to put on any evidence that the condition was satisfied, and granted judgment in favor of defendant and against plaintiff. We affirm the trial court’s judgment.
In 1992, plaintiff, Shirley Kaufman, filed suit against defendant, Corporate Realty, Inc., seeking repayment of funds she alleged she advanced to Westminster Management Corporation (WMC), a predecessor to Corporate Realty, via a line of credit in her name with Citybank, N.A. WMC *971 was a real estate management company that principally managed buildings owned by Mrs. Kaufmann and members of her family, the Latter/Schlesinger family. The individual buildings were each |aowned by various partnerships whose memberships consisted of different combinations of family members. Mrs. Kaufmann was a shareholder in most of these partnerships and hence was a part owner of the buildings managed by WMC/Corporate Realty. WMC, in early 1990, was owned 82% by Lee Schlesinger and 18% by Lisa Schlesinger Herman, both children of Mrs. Kauf-mann. In April of 1990, facing a serious financial crisis, WMC merged with a company owned by Sidney Lassen, Sizeler Asset Management, to become Westminster Sizeler Asset Management, later Corporate Realty. Immediately prior to the merger, Herman tendered her shares to Schlesinger, making him 100% owner of WMC. Several months after the merger, Schlesinger filed suit to have the merger “unwound,” which the federal court denied.[1]
Mrs. Kaufmann filed suit against Corporate Realty in May of 1992, seeking repayment of the $200,000.00 she alleged was outstanding on her advance. In 1994, Mrs. Kaufman filed a Motion for Summary Judgment; Corporate Realty opposed the motion on the grounds of failure of consideration and compromise and settlement. On May 9, 1994, the trial court rendered summary judgment in Kaufman’s favor, finding that Corporate Realty judicially confessed, in the federal court proceeding, liability to Mrs. Kaufman for the debt. This court vacated the summary judgment because discovery was not complete.[2]
Following the remand, Corporate Realty filed third party demands against various buildings and their owners[3], alleging that if Corporate Realty were found pliable to Kaufmann, these parties owed indemnity to Corporate Realty. The suit proceeded until early 1999 with plaintiff filing motions for summary judgment, which were denied. Trial on the merits was held on April 12, 1999, resulting in a judgment against Kaufmann, denying her claim for reimbursement. The trial court in its Judgment with Reasons found that:
“Plaintiffs claim for payment was one conditioned upon the collection of funds from the buildings managed by Defendant. Plaintiff was therefore obligated to present evidence to support that such funds were collected by Defendant and not paid to Plaintiff. Plaintiff failed to offer any evidence to support the collection of these funds during the presentation of its case in chief. Thus, Defendant Corporate Realty, Inc. is entitled to have a judgment in its favor.”
Kaufmann appeals the trial court judgment, arguing that the trial court erred in three respects: 1) Failure to carry out the mandate of the appellate court on remand; 2) failure to apply the rules of estoppel to both the main demand and the third party demands; and 3) failure to consider and/or misapplied the law to the matters set forth in Kaufmann’s Memorandum of Authorities Regarding Anticipated Issues, filed January 12, 1999, claiming that the memo effectuated an amendment to plaintiffs petition.
Both Corporate Realty and the third party -defendants answered Kaufmann’s appeal. Corporate Realty’s answer asked for specific detailed relief in the event this *972 court reversed the judgment. The third party defendants filed no brief in support of their requests for relief. We deem the third party defendants’ answer abandoned under URCA Rule 2-12.4. We affirm the trial court’s judgment, hence we need not reach the issues raised in Corporate Realty’s answer.

J¿FACTS

The following background is taken from the federal court proceeding between these parties:
Lee H. Schlesinger and his sister Lisa Herman were wealthy. As third-generation members of the Latter real estate family of New Orleans, they owned partial shares in several central business district buildings and in Westminster Management Company. Westminster managed the family’s downtown office properties, including three large Poy-dras Street buildings across from the Superdome. By 1986, Schlesinger had purchased all other family members’ shares in Westminster except Herman’s. He owned eighty-two percent and was the only shareholder active in the management of the corporation. Herman owned the remaining stock. The family gave Westminster complete control in managing its properties. Westminster also managed the personal business, including the establishment of credit lines, for several members of the family. Income generated by rental properties, together with borrowings, provided the wherewithal for many of the family members to live in the style to which they had become accustomed.
In 1989, however, the family’s lifestyle collided with the collapse of the New Orleans real estate market to create a cash flow crisis. By the end of 1989, credit lines had been exhausted and the family had insufficient resources to pay ad valorem taxes due. Schlesinger and Herman had drawn on the family’s credit lines in amounts disproportionate to their interest in the properties. Things were particularly bad for Schlesinger. In December 1989, Westminster reported an annual loss for the fourth time in five years, and the company’s books showed a negative net worth of nearly $1.2 million.[4]
At trial on the merits in this case on April 12, 1999, Kirk Stirton, the former chief financial officer of WMC, testified that he worked for WMC from 1982 to 1990. While he was CFO, WMC handled the personal accounts of the Latter/Schlesinger family, including those of Mrs. Kauf-mann. WMC collected income from buildings, made deposits in business partners’ personal bank accounts, paid their bills, and gave them draw checks to cover expenses not paid by WMC directly. Each building had its own cheeking account; WMC did not pay the buildings’ bills out of its (WMC) operating funds. WMC also had expenses, such as salaries, overhead, and bonuses, |Bthat were not particular to any one building. WMC was paid a management fee for its services.
When, as it sometimes happened, a building could not pay its bills, each partner would be requested to advance funds, which counsel compared to a “margin” call. When, as it sometimes also happened, a partner could not meet the margin call, WMC had a line of credit that it could use. The first credit lines were at Hibernia and First NBC banks; when those were exhausted, they were augmented by the Citiline, a line of credit formed by Mrs. Kaufmann in February of 1990. Mrs. Kaufmann pledged her art collection as collateral for the Citiline line of credit. The lines of credit were available to individual family members to use to satisfy negative cash flow of certain building partnerships.
Stirton testified that the 1010 Common Building was the “cash cow” of the group. Latter Center West, the Saratoga Building, and 925 Common, on the other hand, had problems meeting their obligations. *973 He testified that on January 3,1990, a loan was made from 1010 Common to WMC for $450,000.00, as evidenced by a check signed by Lee Schlesinger (transaction 1). On direct examination, Stirton testified that WMC needed the money to cover year-end bonuses. However, on cross he admitted that in a deposition in 1992, Stir-ton said that the loan was not used to pay WMC’s operating expenses, but was used for the purposes of the individual buildings WMC managed, with the loan being made through WMC as a matter of convenience. Citibank was told that the advance was used for the buildings’ ad valorem taxes, which were not WMC’s obligation. When confronted with this difference at trial, Stirton claimed that he was wrong at the 1992 deposition.
According to Stirton’s testimony, WMC obtained the advance from 1010 Common in January of 1990 because the Citiline was not yet available. On February 1719, 1990, a check was drawn on the Mrs. Kauf-mann’s Citiline account, payable to WMC, for $450,000.00. The record then shows a payment from WMC to 1010 Common for $450,000.00 (transaction 2). Stirton testified that this repaid the advance from 1010 Common. Stirton identified a summary accounting for all the activity in the Citi-line account. It showed that seven family members and WMC borrowed from the Citiline account. The account also shows paybacks to Citiline directly from WMC, reducing the outstanding balance of the draw to $200,000.00. Stirton testified that if each individual building had needed cash, the money would have gone directly from the Citiline account into the individual building’s account, and not into WMC’s account.
Stirton testified that there was no dispute that WMC owed the debt to Mrs. Kaufmann, prior to the merger on April 19, 1990, and no dispute about it prior to the day he was discharged on July ■ 18, 1990. He said that some of the buildings owed WMC fees at the end of 1989 and when the merger took place. He also admitted that some of the buildings were foreclosed upon by the lending banks. WMC was appointed “keeper” of those buildings by the banks, and continued to manage them. Stirton continued to work for the Latter/Schlesinger family after he left WMC in 1990.
Lee Schlesinger testified that he was an officer and director of WMC in the 1980s and 1990s. He said that the Citiline account was formed in February of 1990 to help the various buildings and family members meet their needs. Schlesinger said that in January of 1990, “we” borrowed some money from 1010 Common Street to pay some obligations that were due. He said it was meant to be a short term loan. He was the person who approved any transactions on the Citiline account, but the details | sof the transactions were handled by Stirton. At the time of the merger, he considered $200,000.00 an outstanding debt to his mother.
After the merger, Lee Schlesinger’s relationship with Sidney Lassen, who was acting President of the merged company, deteriorated until September, 1990, when Schlesinger wanted to undo the merger. Lassen fired Schlesinger on September 12, 1990; he was locked out of his office, and has never seen the company books since.
Schlesinger testified that the debt to Mrs. Kaufmann from the Citiline account was shown on the books and records of WMC. On cross, Schlesinger admitted that the debt appeared on the books as owed to Citiline, not Mrs. Kaufmann. He did not know whether there was any documentation showing that the Citiline debt was in fact to his mother. He didn’t remember whether the purpose of the 1010 Common loan was to pay ad valorem taxes or not, but he admitted that in 1992, he testified that the $450,000.00 was used to pay debts on the various Latter/Schlesinger properties, and the money was transferred into the WMC account for convenience.
Schlesinger testified that his mother, Mrs. Kaufmann, had no role in the alloca *974 tions of the Citiline funds, nor the distribution of them, nor the payback of them.
Shirley Latter Kaufmann testified that she looked to her son, Lee Schlesinger, for all of the decision making in financial transactions. She would not sign a legal document without his advice first. Mrs. Kaufmann testified that she lent the money from Citiline to Westminster, and that Westminster repaid her $250,000.00, leaving a balance of $200,000.00. She said that she knew nothing about what went on in the business; she offered her paintings for collateral and secured the line of credit from Citiline, because she knew they needed the money. When asked in her deposition _J^whether the repayment of the $200,000.00 was conditional, she stated she didn’t know if there was a condition, she just knew she was owed the money.

ASSIGNMENT OF ERROR NO. 1— MANDATE

In this court’s previous opinion, we vacated the summary judgment and remanded for the completion of discovery. Mrs. Kaufmann argues that the remand was for the limited purpose of allowing the completion of discovery pending at the time of the granting of the original summary judgment and that the trial court erred by allowing a “free-for-all” on remand. Kaufmann’s position is that the district court’s duty on remand was simply to give Corporate Realty a “second chance” to discover facts to rebut the original Motion for Summary Judgment. Though this court remanded “for further proceedings consistent with the views expressed herein,” this court issued no “mandate” on the scope of that discovery or on the course of the litigation following the completion of discovery. This court’s opinion reads, “the trial court judgment dated May 12, 1994 is vacated and this matter remanded to the trial court for further proceeding consistent with the views expressed herein.” Kaufman v. Corp. Realty, supra at p. 1012. We find no language in the opinion that limited the trial court’s authority to allow additional discovery, amend pleadings, or conduct a trial. The first Assignment of Error is without merit.
ASSIGNMENT OF ERROR NO. 2 — ES-TOPPEL; MISPLEADING
Kaufmann argues that Corporate Realty judicially confessed in the federal court suit that it owed $200,000.00 to Mrs. Kaufmann, and that now it should be es-topped from changing that position. Kauf-mann quotes, in her brief, a section of testimony from the federal suit record where she claims Corporate Realty’s eoun-sel |inmade this judicial confession. 'We note, however, that neither of the two federal court opinions (see footnote 1) address this issue.
Admissions in proceedings other than the one currently being adjudicated are considered extrajudicial confessions or admissions. As such, they are evidence, but they do not create conclusive presumptions or operate as an estoppel against the party making them. The only instance where an extrajudicial confession will operate as an estoppel against the party making it is if the party claiming the benefit of the estop-pel was deceived by the admission or relied on it to his prejudice. Douglas Oil Tools, Inc. v. Demesnil, 552 So.2d 77, 80 (La.App. 3rd Cir.1989); Financial Corporation v. Estate of Cooley, 447 So.2d 594, 600 (La.App. 3rd Cir.1984).
Gnagie v. Department of Health and Human Resources, 603 So.2d 206 (La.App. 1 Cir.1992).
Initially, we note that a party is not inexorably bound by testimony given on the witness stand or by factual allegations contained in pleadings from a prior suit, (cites omitted) Such allegations constituted evidence, but not conclusive presumptions or estoppels. Other cases have further indicated that a party litigant is not even bound by factual allegations made in the same suit unless his adversary was mislead or deceived by those allegations to his detriment, (cites omitted) Further, judicial admissions in *975 the same suit have been held not to bar curative amendments. Guidry v. Barras, 368 So.2d 1129, 1132 (La.App. 3 Cir.1979).
Scoggins v. Frederick, 98-1814 (La.App. 1 Cir. 9/24/99), 744 So.2d 676.
We find that Corporate Realty’s counsel’s statements in the federal court proceeding do not constitute judicial confessions in this proceeding and the principle of judicial estoppel is not applicable. Excerpts of proceedings in federal court cited by counsel for both parties reflect that Mr. Butler’s counsel for WMC stated in open court that:
1. The books of WMC reflects that the corporation owed $200,000.00 to someone at the time of the merger.
2. That WMC contended that the $200,000.00 reflected an intercompa-ny account balance.
3. WMC intended to discharge whatever legal obligation it had with regard to said transaction.
In At most, these statements were extra judicial admissions and are merely evidence. Looking at these statements, we find that they do not address the nature or the terms of the advance from Citiline to WMC, and they do not address whether the obligation to repay might have been conditioned upon the buildings’ generation of funds. In fact, during the federal court trial, Corporate Realty’s counsel refused to stipulate to a $200,000.00 purported liability on the books of Corporate Realty at that time.
The second Assignment of Error does not warrant reversal.

ASSIGNMENT OF ERROR NO. 3— MISPLEADING

Mrs. Kaufmann argues that she should not be held to her original petition’s “mispleading,” claiming it was amended by the language of the pre-trial order and the Memorandum of Anticipated Issues. Her original petition stated, in paragraph 2:
In February of 1990, plaintiff authorized Citibank to advance, on her account, $450,000.00 to Westminster Management Corporation (“WESTMINSTER”), for the use and benefit of buildings managed by WESTMINSTER. This advance, along with interest, was to be repaid by WESTMINSTER from funds generated by the buildings managed by WESTMINSTER.
Paragraphs 3 and 4 go on to allege that Westminster had recovered the monies from the buildings and had not repaid Mrs. Kaufmann.
In her brief, Kaufmann argues that the trial court erred in holding her to her original petition that “mispled” the nature of the advance between her and Corporate Realty; specifically, that the repayment was conditioned upon the funds being generated by the buildings. She doesn’t deny that the original petition characterized the transaction this way, but argues that her former counsel “mispled” and that the evidence supports her contention that the loan repayment was not conditional. At no time did Mrs. Kaufmann’s former or present counsel amend her pleadings to change |1g.this assertion. On appeal, Kaufmann argues that Corporate Realty’s denial of this allegation, in its Answer, somehow operates to release her from this position.
In this court’s previous opinion that vacated the trial court’s summary judgment in Mrs. Kaufmann’s favor, this court noted that the advanced funds were to be repaid by funds generated from buildings managed by WMC.
The first place in the record that Mrs. Kaufmann attempts to repudiate her original characterization of the debt is in the Joint Pre-Trial Order, filed on January 7, 1999. This order also references her deposition of August 30, 1996, wherein she stated “I don’t know what it [the obligation of Westminster to pay her back the $200,000] was contingent on. All I know is Westminster owes me $200,000.”
*976 The record as a whole, highlighted by the above evidence, supports the trial court’s finding of fact that the obligation was conditional and that WMC was merely-used as a “flow-through” account. This court notes Mrs. Kaufmann’s statement in her 1996 deposition does not deny that the obligation might be conditional; Mrs. Kaufinann states that she does not know whether it was conditional or not.
Mrs. Kaufmann’s pleading constituted a judicial admission that might have been “fixed” by a curative amended pleading (judicial admissions in the same suit have been held not to bar curative amendments, Guidry v. Barras, 368 So.2d 1129, 1132 (La.App. 3 Cir.1979)), but the admission was never amended. In light of the lack of amendment, and the other evidence highlighted above, the trial court did not err in giving credence to Mrs. Kaufmann’s pleading.
An obligation is conditional if it is dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive. LSA-C.C. art. 1767. The pleadings allege that WMC would repay the advance from funds generated by the buildings. This necessitated the fulfillment of | isthe condition that the buildings generate funds. As previously noted by the testimony, some of these buildings had problems generating enough funds to meet their existing obligations. The event, the buildings’ generation of funds, was uncertain.
The trial court did not err in dismissing Mrs. Kaufmann’s suit, because she presented no evidence that the buildings in fact generated the remaining funds to fulfill the conditional obligation to repay her advance. The right to enforce the obligation does not arise until the fulfillment of the suspensive condition, and the obligation may not be enforced until the condition is met. Hampton v. Hampton, Inc., 97-1779 (La.App. 1 Cir. 6/29/98), 713 So.2d 1185, 1190.
Accordingly, we affirm the judgment of the trial court.
AFFIRMED.

. The details of this merger are found in Schlesinger v. Herzog, et al, 2 F.3d 135 (5 th Cir.1993) and Schlesinger v. Herzog, et al, 1992 WL 193531 (E.D.La.1992)(not reported in F.Supp.).

. Kaufman v. Corporate Realty, 94-526 (La.App. 5 Cir. 12/14/94), 648 So.2d 1010.

.The third party defendants are: Schlesinger, Kirk Stirton (CFO of WMC), Lee H. Schlesinger Agent Partnership, Westminster 925 Common Building Partnership, Westminster Saratoga Building Partnership, Latter and Kaufmann Partnership, Westminster 1010 Common Building Partnership, Corporate Atrium Partnership, Fountainbleau Associates, and ABC Partnership.

. Schlesinger v. Herzog, et al., 2 F.3d 135, 137 (5 th Cir. 1993).