United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 28, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-31013

STEPHEN P. MUMBLOW, Plaintiff-Appellant,

VERSUS

MONROE BROADCASTING, INC., Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

Before SMITH and GARZA, Circuit Judges, and VANCE,[*] District
Judge.

VANCE, District Judge:

Stephen P. Mumblow appeals the trial court's decision to
apply Louisiana law to this case and its dismissal of his claim
as premature.  Because the trial court properly chose to apply
Louisiana law to this case but made clearly erroneous findings of
fact, we AFFIRM in part, REVERSE in part, and REMAND the matter
for further proceedings consistent with this opinion.

---

[*]District Judge of the Eastern District of Louisiana,
sitting by designation.

I.   FACTS AND PROCEEDINGS BELOW

Appellant Stephen Mumblow, a New York resident, was the president of Communications Corporation of America, a Louisiana corporation, from September 1998 until January 2002. Thomas Galloway is the principal shareholder and Chairman of CCA, and D. Wayne Elmore is an officer, director and shareholder of CCA. Gregory Todd Boulanger is the controller of CCA. Mumblow did not own stock in CCA. He agreed with CCA that after three years with CCA, he would be entitled to ten percent of the net proceeds upon the sale of the company.

Monroe Broadcasting is a Louisiana corporation that operates a television station in Monroe, Louisiana. Monroe is owned by Charles Chatelain and Dr. Paul Azar. None of the principals of CCA holds a position with Monroe. In late 1997, Galloway, as the head of CCA, acquired other broadcasting properties from Chatelain. As part of that deal, Chatelain required Galloway to indemnify him and Azar against the financial risk of owning and operating Monroe and to assume financial responsibility for Monroe. That arrangement was eventually memorialized in a "put/call" agreement that gave Galloway the right to buy, and Monroe the right to call upon Galloway to buy, Monroe for a price that was the sum of Monroe's debts and liabilities. CCA also entered a consulting arrangement with Monroe under which it

provided daily operational services to Monroe.[1]  CCA was never

paid for its services.  Rather, Monroe regularly issued notes in

CCA's favor, reflecting the amount owed for the services.

Chase Manhattan Bank loaned CCA money.  In October 2000,

Chase required Galloway to stop drawing his salary from CCA

because of CCA's weakened financial condition.  At the time,

Galloway had contributed over one million dollars to Monroe for

its daily operations.  Mumblow suggested to Elmore that they

advance their salaries from CCA to Monroe to ease the burden on

Galloway.  On October 31, 2000, Mumblow began advancing his

salary checks, in the amount of $14,000 per month, to Monroe.[2]

In June 2000, the principals of Monroe, with the assistance

of Galloway, Elmore and Mumblow, arranged a working capital

infusion for Monroe by refinancing its existing indebtedness

through a loan from Whitney Bank.  Whitney required an additional

two million dollars in collateral for the loan.  Mumblow

originally agreed to put up $500,000, but he withdrew his offer

---

[1] The contract is actually with Communications Corporation
of Monroe, a subsidiary or sister corporation of CCA, which CCA
created for the purpose of providing services to Monroe.  For
clarity, we refer to the corporation that manages Monroe as CCA.

[2] The trial court determined that the payments constituted a
loan.  Although Monroe appears to maintain, as it did at trial,
that the payments were either an investment or a donation, it
concurred with Mumblow's statement of issues, which does not
appeal the trial court's determination that the payments
constituted a loan.  For that reason, and because Monroe concedes
that it "accept[s] the result of the trial court's judgment" on
this issue (Appellee's Brief at 11), we do not review that
judgment.

shortly before the loan closed.  Galloway made up the difference.
The $10,000,000 loan agreement, which included an additional
$1,000,000 line of credit, became final in December of 2000.
Mumblow continued to turn over his salary checks to Monroe until
August 15, 2001.  Other than the cancelled checks, no documents
exist to memorialize Mumblow's loan.  Monroe's financial
statements show the payments as notes payable under the category
of long-term liabilities.  Mumblow stopped working for CCA in
January of 2002.

On or about December 21, 2001, Mumblow demanded repayment of
the loan.  Monroe refused to repay Mumblow.  On January 18, 2002,
Mumblow sued Monroe on the loan in the United States District
Court for the Western District of Louisiana.  The parties
consented to a trial by Magistrate Judge C. Michael Hill.  After
a bench trial, the court found that (1) Louisiana law governs the
choice of law determination; (2) Louisiana law applies to the
transactions, and the transactions constitute a loan; (3) under
applicable Louisiana law, the loan is subject to an implied
suspensive condition that suspends Mumblow's right to demand
repayment until Monroe's assets are either sold or merged; and
(4) Mumblow's demand for repayment is premature because the
suspensive condition has not matured.  The court entered judgment
in favor of Monroe and dismissed the action.  Mumblow timely
appeals.

## II.  STANDARD OF REVIEW

4

We review choice of law questions *de novo*. *Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 674 (5th Cir. 2000). We review the trial court's findings of fact and inferences deduced therefrom for clear error. *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 745 (5th Cir. 1999). We review the legal conclusions the trial court reached based upon factual data *de novo*. *Id*. at 746.

## III. DISCUSSION

### A. Choice of Law

In diversity cases, we apply the law of the forum state to determine which state's law applies. *Woodfield v. Bowman*, 193 F.3d 354, 359 n.7 (5th Cir. 1999). Here, the forum state is Louisiana, and we would ordinarily apply its choice of law provisions.

We have previously held, however, that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary," and we simply apply the law of the forum state. *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002); *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990) (when the substantive decisional law of all relevant jurisdictions is the same, a court need not "go through the motions" of making a choice of law); *see also Travelers Ins. Co. v. McDermott, Inc.*, No. CIV.A. 01-3218, 2003 WL 21999354, at *7 (E.D. La. Aug. 22, 2003) (when the laws of Louisiana and

5

Connecticut are in harmony, no choice-of-law analysis is necessary). Here, the parties assert that the two states with an interest in the transaction are New York and Louisiana. Mumblow, in challenging the trial court's determination that the loan is subject to a suspensive condition, argues that New York contract law, unlike Louisiana contract law, would render the suspensive condition found by the trial court unenforceable.

We conclude, however, that the controlling issue in this matter is whether there is substantial evidence to support the trial court's determination that Monroe's repayment obligation is conditioned on the sale or merger of Monroe's assets. *See* discussion, *infra*, at Part III.B. Thus, we first consider whether the substantive contract law of New York and Louisiana conflicts on the issue of the interpretation of oral contracts and the evidence used to determine their terms, including terms that suspend the existence of a party's obligation until the occurrence of a condition (known as a condition precedent under New York law and a suspensive condition under Louisiana law). *See Southern States Masonry, Inc. v. J.A. Jones Constr. Co.*, 507 So.2d 198, 204 n.15 (La. 1987) (citing *City of New Orleans v. Tex. and Pac. Ry. Co.*, 171 U.S. 312, 334 (1898)). Because we conclude that the substantive contract law of New York and Louisiana is in harmony on these issues, no choice of law analysis is necessary, and we apply Louisiana law.

The law of New York and Louisiana is in agreement on the following principles of contract interpretation that are relevant to the issue under review.  First, both states' laws and jurisprudence, in the absence of a writing, look to the parties' intent to determine the terms of an oral agreement, including whether a condition was part of the agreement.  *Compare Ferrer v. Samuel*, 746 N.Y.S.2d 242, 243 (N.Y. Dist. Ct. 2002) (noting that courts, in interpreting an oral agreement, "typically look to the objective intent manifested by the parties at the time they contracted"), *with* LA. CIV. CODE art. 1768 ("Conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or the intent of the parties."), *and* LA. CIV. CODE art. 2045 ("Interpretation of a contract is the determination of the common intent of the parties.").  Second, both states' laws and jurisprudence require the party who relies on the condition to suspend his obligation to prove that the condition was part of the agreement.  *Compare Abacus Real Estate Fin. Co. v. P.A.R. Constr. and Maint. Corp.*, 496 N.Y.S.2d 237, 238 (N.Y. App. Div. 1985) (requiring defendants who asserted that their obligation was subject to an oral condition precedent to prove the condition was part of the agreement), *with Sam's Style Shop v. Cosmos Broad. Corp.*, 694 F.2d 998, 1004 (5th Cir. 1982) (finding that Louisiana law requires one who relies on a suspensive condition to prove the existence of the condition).

7

Third, under both states' laws and jurisprudence, courts avoid construing an agreement as subject to a condition suspending the existence of an obligation, unless there is clear evidence of the parties' intent to include such a condition in the agreement. *Compare Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576, 581 (1992), *with Southern States Masonry, Inc.*, 507 So.2d at 201 (stating that Louisiana courts avoid construing contractual provisions as suspensive conditions whenever possible), *and Hampton v. Hampton, Inc.*, 713 So.2d 1185, 1190 (La. Ct. App. 1998) (stating that Louisiana courts find a suspensive condition only when the express language of the contract *compels* such a construction) (emphasis added). Because there is no apparent conflict between the law of New York and Louisiana with respect to the determinative issue in this case, that is, whether there is substantial evidence to support the trial court's determination that Monroe's repayment obligation was subject to a condition, we need not engage in a choice-of-law analysis. Instead, we apply the law of the forum state, Louisiana. *See Schneider Nat'l Transp.*, 280 F.3d at 536.

**B. The Implied Condition on Monroe's Repayment Obligation**

Mumblow argues that the trial court erred when it found that Mumblow's right to demand repayment was conditioned on the sale or the merger of Monroe's assets because there was not enough evidence to support that determination. Under Louisiana law, "an

obligation is conditional if it is dependent on an uncertain event." *Kaufman v. Corporate Realty, Inc.*, 759 So.2d 969, 976 (La. Ct. App. 2000). Conditions on an obligation may be implied by the law, the nature of the contract, or the intent of the parties. LA. CIV. CODE art. 1768. A finding that the parties intended an obligation to be conditional is a finding of fact that we review for clear error. *Gebreyesus v. F.C. Schaffer & Assoc., Inc.*, 204 F.3d 639, 642 (5th Cir. 2000); *Kaufman*, 759 So.2d at 976; *Hampton*, 713 So.2d at 1189 ("Intent is an issue of fact which is to be inferred from all of the surrounding circumstances."). We conclude that clear error exists when:

> (1) the findings are without substantial evidence to support them, (2) the court misapprehended the effect of the evidence, and (3) if, although there is evidence which if credible would be substantial, the force and effect of the testimony, considered as a whole, convinces the Court that the findings are so against the great preponderance of the credible testimony that they do not reflect or represent the truth and right of the case.

*Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 283 (5th Cir. 1987). Before we will disturb the trial court's factual findings, we must be "left with the definite and firm conviction that a mistake has been made." *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 533 (5th Cir. 2003). Because we have thoroughly reviewed the record and are left with such a conviction, we reverse.

As evidence that the parties intended Monroe's repayment obligation to be subject to a suspensive condition, the trial

9

court found that Mumblow knew that Monroe's financial condition was weak, that Mumblow testified that when he was making the loan, he did not expect to demand repayment, and that Mumblow and the others making the loans only hoped to be repaid. (Reasons for J. at 7). The court inferred that, because "everyone knew that Monroe was not in a position to immediately repay the loan extended by Mumblow, . . . it is clear that everyone intended that repayment would occur only when Monroe was sold at a profit or if Monroe, or its assets, was merged into CCA." (*Id*.). Because the record does not contain substantial evidence to support the trial court's finding, we conclude that the court clearly erred in inferring a suspensive condition.

None of the evidence the trial court cited substantially supports its inference that the parties intended Monroe's repayment obligation to be conditioned on the sale or merger of its assets. The effect of a suspensive condition is that no obligation to perform arises on the part of Monroe, unless and until the condition is fulfilled. In other words, if Monroe is never sold or merged, Mumblow will never have the right to be repaid his $140,000. Perhaps in recognition of the fact that suspensive conditions mean that one party intends to assume an added contractual risk before that party can demand reciprocal performance, *i.e.*, that the condition be fulfilled, Louisiana courts do not infer such conditions without very strong proof.

*See Southern States Masonry, Inc.*, 507 So.2d at 205 (finding that to construe an agreement as requiring one party to wait for payment until a condition is fulfilled, which might never occur, would give the agreement "an unreasonable construction which the parties did not intend"). Indeed, they do so only when the express language of the contract "compels" such a construction. *See Hampton*, 713 So.2d at 1190. In the context of an oral agreement such as this one, such a condition should not be inferred unless there is clear evidence that the parties agreed on such a condition. Further, the party who relies on a suspensive condition, in this case Monroe, has the burden of proving its existence. *Sam's Style Shop*, 694 F.2d at 1004. The trial court neither discussed nor assigned the burden of proof when it found the suspensive condition. Because suspensive conditions are disfavored and the burden of proof is on the party relying on the condition, the trial court should not have inferred a suspensive condition in the absence of evidence that would at least substantially support that inference. In this case, no such evidence exists, and the trial court's inference is therefore clearly erroneous.

The trial court first relied on Monroe's weak financial condition and Mumblow's knowledge of that condition to infer that the parties intended Monroe's repayment obligation be suspended until after a sale or merger of its assets. Significantly, no

11

witness actually testified that the parties intended to condition Monroe's repayment obligation to Mumblow on a sale or merger of Monroe's assets. Mere evidence of Monroe's weak financial condition neither requires nor substantially supports the trial court's inference that the parties intended Monroe's repayment obligation to arise only if Monroe's assets were sold or merged. That Mumblow knew that Monroe was financially weak simply does not overcome the common sense understanding, mandated by Louisiana precedent, that the parties to a contract do not intend a suspensive condition in the absence of strong evidence of such intent.

Further, there was evidence that Monroe could in fact repay the loan. Monroe had an unused one million dollar line of credit at Whitney National Bank until the end of 2002, against which it was free to borrow to pay off debts or otherwise use as it saw fit. (Tr. Transcript at 61). Although there was testimony that the owners of Monroe were opposed to drawing on this line of credit (*see id*. at 80), Galloway was obligated to indemnify the owners of Monroe as to any amount they might owe on that debt. (*Id*. at 46). But even if the trial court were correct that Mumblow knew that he realistically would not obtain repayment until the company's financial condition improved, it simply does not follow that the parties intended that Monroe's repayment obligation would never arise unless there was a sale or merger of its assets. The condition the court inferred would mean that

12

Mumblow had no right to demand repayment without a sale or merger, even if Monroe generated a positive cash flow and could service its other debts.  Not only does evidence of Monroe's weak financial condition, without more, not suggest such a restrictive condition, but the sale or merger condition is also contradicted by Boulanger's testimony that if Monroe generated a positive cash flow, Mumblow would be able to get his money back, even without a disposition of Monroe's assets.  (*Id*. at 43).

The other evidence in the record also does not substantially support the trial court's conclusion that the parties intended Monroe's repayment obligation to be conditional.  The trial court characterized Mumblow's testimony as an acknowledgment that when he was making the loan, he did not expect to demand repayment. (Reasons for J. at 8).  Mumblow explained that he told Elmore on several occasions that, "we could ask for our money any time you wanted to, but I knew that if I asked for payment, I couldn't get payment at that time."  (*Id*. at 126).  This acknowledgment of an economic reality does not substantially support an inference that Mumblow also intended Monroe's repayment obligation to be conditional, a provision that would only further frustrate his ability to collect on Monroe's obligation.  This is particularly true since Mumblow denied that there was any such condition.

There is not much evidence in the record from which to discern Monroe's intentions as to its repayment obligation.  One thing is clear, there is no direct evidence that Monroe intended

13

the obligation to be conditional.  The owner of Monroe, Chatelain, testified that he did not know about the loan until Mumblow instituted the current proceedings by demanding repayment.  (Tr. Transcript at 51).  On Elmore's instructions, the notes were classified by Boulanger, the CCA controller who kept Monroe's books, as notes payable under the category of long-term liabilities.  But Boulanger testified that the notes reflecting Monroe's obligation to CCA for services under the consulting agreement were likewise classified as notes payable under the category of long-term liabilities, when they in fact were demand notes.  (*Id*. at 37).  Boulanger did not testify as to the proper way to account for a loan subject to a suspensive condition, or state that Mumblow's loan was accounted for as a long-term liability because it was conditional.  Indeed, Boulanger admitted that Mumblow said nothing to him about a condition on his right to demand repayment, although Mumblow joked that Monroe would have difficulty repaying the loan.  (*Id*. at 30).  This scanty evidence plainly does not provide substantial support for the trial court's finding that Monroe's obligation was conditioned on the sale or merger of Monroe's assets.

In contrast, the inference that the parties did not intend to impose such a condition is substantially supported by the evidence in the record.  Mumblow testified that he expected to demand repayment eventually (Tr. Transcript at 127), that he was

14

sure it was his "right" to ask for repayment (*id*.), and that he asserted to Elmore on several occasions that they could ask for repayment any time they wanted to (*id*. at 126), testimony that neither Elmore nor anyone else contradicted. Mumblow also testified that Elmore told him that Elmore would have notes payable drawn up on the advances, though the notes were never produced. (*Id*. at 105). Mumblow wrote "payables" on the last check he sent to Monroe, by which he meant to indicate that the checks "were the notes payable according to the financial statements of Monroe Broadcasting that recorded my loan to them." (*Id*. at 100-101). Elmore admitted that Mumblow never said to him that Mumblow "was placing a restriction on his right to demand repayment of the money." (*Id*. at 60). All of this testimony contradicts the trial court's finding that Mumblow intended Monroe's repayment obligation to be subject to a suspensive condition.

The only evidence that could potentially support an inference that Monroe's repayment obligation was conditional is Elmore's testimony that neither he nor Mumblow expected to get his money back unless Monroe's financial condition improved and the company was sold. (Tr. Transcript at 78, 81, 86). Elmore did not testify that either he or Mumblow specifically agreed to forego any right to repayment unless the company was sold or merged. His statement was based on his assertion that both he and Mumblow knew that Monroe was "under water to the tune of

15

about $5 million." (*Id*. at 81). In fact, Elmore admitted that Mumblow never told him that Mumblow placed any restriction on his right to be repaid. Elmore's weak testimony as to his and Mumblow's "expectation" is not of the caliber necessary to substantially support the finding of a suspensive condition. *See J.C. Frantz v. Vitenas*, 347 So.2d 284, 285 (La. Ct. App. 1977) (finding that defendant failed to show that his verbal payment obligation was conditioned because the record contained no evidence that he expressly conditioned his obligation on the happening of an uncertain event, and the condition could not reasonably be implied from the nature of the contract or the presumed intent of the parties). Lacking such evidence, bearing in mind that the burden of proof is on Monroe, and considering Mumblow's ample testimony that his intent was for Monroe's repayment obligation to be unconditional, we conclude that the trial court's finding that a condition existed lacks substantial support.

Accordingly, we conclude that the trial court clearly erred when it inferred that Monroe's obligation is subject to a suspensive condition, and we reverse the trial court's judgment in favor of Monroe and its dismissal of Mumblow's complaint as premature.[3]

---

[3] We note that the trial court dismissed the complaint but did not specify that the dismissal was without prejudice. Under Federal Rule of Civil Procedure 41, a dismissal for prematurity should have been without prejudice because it does not operate as

16

## C. Mumblow's Remaining Arguments

Because we hold that the trial court clearly erred when it found an implied suspensive condition on Monroe's repayment obligation and dismissed Mumblow's claim as premature, we need not consider Mumblow's remaining arguments that the trial court erred in failing to define the terms of the condition and in failing to grant judgment in Mumblow's favor subject to the satisfaction of the condition.

## D. The Remand

There is no evidence in the record that would support a determination that the parties intended to fix a term for repayment of the loan. Louisiana law dictates that when an agreement does not specify a term for repayment of a loan, repayment is due in a reasonable time. *See* LA. CIV. CODE art. 1778; *Sanders v. Russell*, 864 So.2d 219, 222 (La. Ct. App. 2003) (finding that when parties did not fix a term for repayment of a loan, term was undeterminable and therefore repayment was due within a reasonable time); *Parquette v. Arceneaux Music Ctr., Inc.*, 425 So.2d 362, 364 (La. Ct. App. 1982) (finding that when no time limit for repayment of loans had been discussed, parties intended that loan would be repaid within a reasonable time and that a reasonable time (six months) had expired by the time suit was filed); *see also LeBlanc v. City of Plaquemine*, 448 So.2d

---

an adjudication on the merits. FED. R. CIV. P. 41(b).

17

699, 703 (La. Ct. App. 1984) ("In the absence of an express stipulation as to the term of a contract, Louisiana courts will infer a reasonable term from the nature of the contract and the circumstances of the case."); Saul Litvinoff, THE LAW OF OBLIGATIONS: PUTTING IN DEFAULT AND DAMAGES § 1.9 (2d ed. 1999) (stating that, although the parties to a "friendly" loan may not name a time by or at which the money must be paid back, it is clear that they do not intend repayment to be made immediately after the borrower receives the money from the lender and, in such a case, if the time for repayment is not determinable, payment is due in a reasonable time). We remand this matter to the trial court to determine whether a reasonable time for repayment of the loan has expired.

## IV. CONCLUSION

For the foregoing reasons, the judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.