# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-40325

United States Court of Appeals
Fifth Circuit

**FILED**
November 11, 2019

Lyle W. Cayce
Clerk

AGGREKO, L.L.C.,

       Plaintiff

v.

CHARTIS SPECIALTY INSURANCE COMPANY, formerly known as
AIG Specialty Insurance Company,

       Defendant

*********************************************************************

INDIAN HARBOR INSURANCE COMPANY,

       Plaintiff - Appellant Cross-Appellee

v.

THE GRAY INSURANCE COMPANY,

       Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before JOLLY, COSTA, and ENGELHARDT, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge.

No. 18-40325

Indian Harbor Insurance Company ("Indian Harbor"), the plaintiff in one of two consolidated lawsuits pending below, appeals the district court's grant of summary judgment in favor of defendant The Gray Insurance Company ("Gray"). Gray, in turn, "conditionally" appeals the district court's decision to apply Texas law, instead of Louisiana law, to the issues before it, asking us to only consider its appeal if we conclude that we are unable to affirm the summary judgment under Texas law. For the reasons set forth below, we AFFIRM.

## I.

The consolidated lawsuits in this matter arise out of fatal injuries suffered by James Andrew Brenek, II ("Brenek") when he was electrocuted by an electrically-energized generator housing cabinet on a rig in Jefferson County, Texas. At the time of his accident, Brenek was employed by and performing work for Guichard Operating Company, L.L.C. ("Guichard"), a drilling subcontractor located in Crowley, Louisiana. Guichard had leased the generator involved in the incident from Aggreko, L.L.C. ("Aggreko"), a Delaware company doing business in both Louisiana and Texas. The rental agreement between Guichard and Aggreko required Guichard to maintain a commercial liability insurance policy during the lease period that would cover damages arising out of use of the leased equipment and recognize Aggreko as an additional insured.

On the date of Brenek's accident—July 27, 2014—Guichard had in place a primary commercial liability policy issued by Gray ("the Gray Policy") and an excess commercial liability policy issued by Chartis Specialty Insurance Company, also known as "ASIC" ("ASIC"). Aggreko had in place a primary insurance policy issued by Indian Harbor. Relevant to the issues before us, Gray is a Louisiana corporation that has its principal place of business in Metairie, Louisiana and regularly conducts business in Texas. Indian Harbor

2

is a Delaware corporation with its principal place of business in Stamford, Connecticut.

Following their son's death, Brenek's parents ("the Breneks") filed a tort suit in Texas state court against Aggreko and Rutherford Oil Corporation ("Rutherford"), the owner of the rig on which Brenek's accident occurred.[1] Thereafter, Gray agreed, in response to demands by Aggreko and Rutherford, to indemnify and defend them as additional insureds under the Gray policy.[2] ASIC, on the other hand, advised Aggreko, upon learning of the Breneks' lawsuit, that Aggreko did not qualify as an additional insured under the policy it issued to Guichard. In response, Aggreko filed suit against ASIC in Texas state court, seeking declaratory relief with respect to ASIC's alleged obligations to Aggreko under its policy. ASIC then removed the suit to the United States District Court for the Eastern District of Texas.

Despite Aggreko's lawsuit against ASIC, Gray maintained its defense of Aggreko with respect to the lawsuit filed by the Breneks. The Gray policy had a liability limit of $1,000,000, subject to a $50,000 self-insured retention. On February 8, 2017, Gray and the Breneks reached two separate agreements regarding the Breneks' claims against Rutherford and Aggreko. With respect to Rutherford, Gray agreed to pay the Breneks $50,000 in exchange for a full and complete release of any and all claims that the Breneks had against Rutherford arising out of their son's accident and death. With respect to Aggreko, Gray agreed to pay the Breneks $950,000 on behalf of Aggreko in exchange for the Breneks' agreement to execute any subsequent judgment obtained by the Breneks as to Aggreko only against available insurance. On the same date, Gray issued to the Breneks and their attorneys two checks—

---

[1] *See James Andrew Brenek, et al. v. Aggreko, L.L.C. and Rutherford Oil Co.*, No. E-196603, 172nd District Court of Jefferson County, Texas.

[2] Rutherford had also contracted with Guichard and was considered an additional insured under the liability policy issued to Guichard by Gray.

one in the amount of $50,000, and one in the amount of $950,000. On March 3, 2017, the Breneks executed a "Release and Settlement Agreement" and a "Covenant Not To Execute Agreement" ("Covenant Not To Execute") setting forth the formal terms of the respective agreements they entered into with Gray.

Consistent with the February 8 agreement between Gray and the Breneks regarding Aggreko, the Covenant Not To Execute states that, by executing the agreement, the Breneks "jointly and severally, promise[], agree[] and covenant[] that they shall not seek to and will not execute on any Judgment obtained in their favor and against Aggreko in the Lawsuit save and except to the extent they can recover the Judgment from any insurance company which provides coverage to Aggreko." The Covenant Not to Execute further provides that the Breneks would "enforce any and all such Judgment against the available insurance only, and not against the assets of Aggreko or its respective present or former directors, officers, employees, [or] parent companies." Additionally, the agreement indicates that the Breneks "acknowledge[] and agree[] that Aggreko retains whatever rights it may have under the law to reduce the amount of any damage award against it by way of settlement credit, proportionate responsibility, Tex. Civ. Prac. & Rem. Code Chapter 33, the One-Satisfaction Rule, or otherwise."

Taking the position that it had exhausted its policy limit and its obligation to Aggreko, Gray notified Aggreko by letter dated February 9, 2017 that it intended to withdraw its defense in the Breneks' pending state lawsuit 30 days from the date of the letter. In support of its position, Gray pointed to the following language from its policy:

4

## SECTION I—COVERAGES

## COVERAGE A.    BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement.

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies . . . .  But . . .

2.    Our right and duty to defend end when we have used up the applicable limit of insurance in payment of judgments or settlements under Coverage[] A . . . .

The Gray policy does not define the terms "judgments" and "settlements." Noting that it had paid the $1,000,000 policy limit "in settlement regarding the Brenek occurrence," Gray advised that it had no further obligations under the policy.

Gray subsequently denied requests of Aggreko and Indian Harbor to maintain its defense of Aggreko.  As a result, Indian Harbor instituted a declaratory action, also in the United States District Court for the Eastern District of Texas, seeking, among other things, recognition that Gray maintained a duty to defend Aggreko.  Shortly thereafter, the district court issued an order consolidating Aggreko's lawsuit against ASIC with Indian Harbor's lawsuit against Gray.

After consolidation, Gray filed a motion for summary judgment in which it sought a declaration that it had exhausted its policy limits and no longer had a duty to defend or indemnify Aggreko.  ASIC and Indian Harbor filed memoranda in opposition to Gray's motion, while Aggreko filed a response stating that its substantive arguments would be included in Indian Harbor's memorandum.  Indian Harbor also, in turn, filed a cross-motion for summary judgment in which it asked the district court to determine that Texas law applies to the issues raised in the consolidated lawsuits; that the Covenant Not

No. 18-40325

to Execute did not constitute a "settlement" of any of the Breneks' claims against Aggreko under Texas law and, therefore, that Gray had not exhausted its policy limit with respect to such claims; that Gray had an ongoing duty to defend Aggreko in the Breneks' lawsuit; and that Gray was required to reimburse Indian Harbor for any costs spent in Aggreko's defense. Gray filed a memorandum in opposition to Indian Harbor's motion.

The district court granted Gray's motion and denied Indian Harbor's motion, except that it determined, in accordance with Indian Harbor's request, that Texas law—as opposed to Louisiana law—was applicable to the issues before it. Specifically, the court held that:

> [A]s a matter of law, . . . (1) Texas law is controlling for both the Gray Policy and the Covenant Not to Execute; and (2) Gray's payment of the policy limits and the Breneks' execution of the Covenant Not to Execute against Aggreko and the release of Rutherford terminates Gray's duty to defend and indemnify its insureds.

Indian Harbor now appeals the district court's order. As noted above, Gray asks this court to affirm the district court's ruling but submits a "conditional" cross-appeal, urging us to reverse the district court's conclusion that Texas law applies to the issues at hand and affirm the district court's grant of summary judgment in favor of Gray by applying Louisiana law in the event that we conclude the judgment cannot be maintained under Texas law.

## II.

This court reviews choice-of-law determinations *de novo* but reviews the district court's underlying factual determinations for clear error. *Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d 616, 620 (5th Cir. 2005); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Eurocopter Corp.*, 692 F.3d 405, 408 (5th Cir. 2012) ("A district court's choice-of-law determination is a legal conclusion."). We also review a district court's interpretation of state law *de*

No. 18-40325

*novo. Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 764 (5th Cir. 2019).

Likewise, we review grants of summary judgment de novo, "applying the same standard that the district court applied." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003) (internal quotation marks and citation omitted). The court must "view the evidence introduced and all factual inferences [therefrom] in the light most favorable to the party opposing summary judgment." *Smith*, 827 F.3d at 417 (internal quotation marks and citation omitted). "We may affirm the district court's grant of summary judgment on any ground supported by the record and presented to the district court." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015).

As further discussed below, neither party identifies any material fact that is in dispute. Thus, our resolution of this appeal revolves on proper interpretation and application of the applicable law.

III.

1.

Since the issue of whether the district court applied the correct state's law to resolve the matters before it is of primary importance in determining whether the district court ultimately reached the correct result in granting Gray's request for summary judgment, we reject Gray's categorization of its appeal as "conditional." Either the district court applied the correct law, or it did not. Whether the district court applied the correct law cannot and does not revolve on whether it reached a result that benefits Gray. Thus, we will

address the propriety of the district court's decision to apply Texas law regardless of whether we agree with the court's conclusion under Texas law.

Federal courts exercising diversity jurisdiction generally must apply the choice-of-law rules of the forum state to determine the applicable substantive law. *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014). A choice-of-law analysis is unnecessary, however, if the laws of the states with an interest in the dispute do not conflict. *Mumblow*, 401 F.3d at 620. Under such circumstances, the substantive law of the forum applies. *Id.*

Before the district court, Gray argued that there is no conflict between the laws of Texas and Louisiana—the two states that have an interest in this matter—with respect to whether it exhausted its obligations under its policy. Gray asserted, however, that if the court found a conflict to exist, Louisiana law should be applied to the dispute. Indian Harbor, on the other hand, contended that Texas law governs. After finding that a potential conflict exists between Texas and Louisiana law with respect to the issues before it due to Louisiana's allowance of direct actions by third parties against liability insurers and Texas's rejection of such actions, the district court engaged in a conflict-of-laws analysis and concluded that the Gray policy should be interpreted under Texas law.

Initially, we note that the parties do not point to, and we are unaware of, any pertinent difference between Texas law and Louisiana law with respect to interpreting insurance policies. Under the laws of both states, an insurance policy is a binding agreement that defines the relationship between the insurer and insured and dictates the obligations each has to the other, subject to applicable state regulations. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018) ("[A]n insurance policy is a contract that establishes the respective rights and obligations to which an insurer and its insured have mutually agreed." (internal quotation marks and citations

omitted)); *Supreme Servs. and Spec. Co. v. Sonny Greer, Inc.*, 958 So. 2d 634, 638 (La. 2007) ("An insurance policy is a conventional obligation that constitutes the law between the insured and the insurer, and the agreement governs the nature of their relationship.")  Accordingly, under both Texas and Louisiana law, insurance policies are to be interpreted in accordance with general rules governing interpretation of contracts, and words and phrases contained therein should be given their plain and ordinary meaning.  *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (discussing legal precepts for interpreting insurance policies); *Bonin v. Westport Ins. Corp.*, 930 So. 2d 906, 910–11 (La. 2006) (same).  Further, both states require true ambiguities in policy language to be construed in favor of coverage.  *See id.*

Nevertheless, we look further to whether Texas law and Louisiana law potentially dictate different outcomes with respect to the particular dispute at hand.  As noted above, the policy issued by Gray to Guichard required Gray to defend Aggreko with respect to the lawsuit filed by the Breneks until such time as Gray "used up the applicable limit of insurance in payment of judgments or settlements under Coverage[] A."  There is no dispute that Gray paid its limit of insurance to the Breneks relative to their claims against Gray's additional insureds, Rutherford and Aggreko.  There is also no dispute that there has been no judgment against Aggreko in the lawsuit filed by the Breneks.  Thus, the narrow question that is presented is whether Gray's payment of $950,000 to the Breneks on behalf of Aggreko in exchange for their covenant not to execute any judgment against Aggreko, except as to available insurance, constituted a "settlement" under the Gray Policy sufficient to relieve Gray of its duty to defend Aggreko.  In other words, is a release of tort liability required in exchange for the payment of policy proceeds for a "settlement," as anticipated by the Gray Policy, to occur?  To determine whether a conflict exists

between Texas law and Louisiana law as to this issue, we must engage with the merits of the issue under the laws of both states.

"When evaluating issues of state law, we look to the decisions of the state's highest court." *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). The parties have not identified any cases from the Texas Supreme Court or the Louisiana Supreme Court that are precisely on point as to the issue before us. Further, our review of Texas and Louisiana jurisprudence does not reveal any such cases. Under these circumstances, "we must make an *Erie* guess and determine as best we can" how the highest courts of each state would resolve such issue. *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019) (quoting *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 611 (5th Cir. 2016)). To do so, we must consult "the sources of law that the state[s'] highest court[s] would look to, including intermediate state appellate court decisions, the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Id.* (quoting *Hays*, 838 F.3d at 611). Because of Louisiana's "civilian methodology," in determining how the Louisiana Supreme Court would resolve the present issue, we must give primary importance to Louisiana's constitution, codes and statutes. *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 851 (5th Cir. 2019) (internal quotation marks and citations omitted). We must refrain, however, from "adopt[ing] innovative theories of recovery under state law without strong reason to believe that those theories would be adopted if [the state's highest court] had the opportunity." *Martinez*, 935 F.3d at 398–99 (internal quotation marks and citation omitted).

We note that if a prior panel of this court made an *Erie* ruling under Texas or Louisiana law as to the issue before us, and that ruling has not been superseded by either state statute or caselaw, then we are bound by that panel's prior decision. *See Welborn v. State Farm Mut. Auto. Ins. Co.*, 480 F.3d 685, 687 (5th Cir. 2007).

No. 18-40325

2.

a.

We first analyze the issue before us under Texas law. Indian Harbor argues that, under Texas law, the payment of Gray's policy proceeds on behalf of Aggreko in exchange for the Covenant Not to Execute is not a "settlement" sufficient to have relieved Gray from its duty to defend Aggreko under the Gray Policy, since it did not release Aggreko from any tort liability or end any part of the Breneks' lawsuit against Aggreko. Indian Harbor further contends that Gray's actions are part of a "strategy" to shift its duty to defend to Indian Harbor, an excess insurer. Indian Harbor primarily points to this court's decision in *Continental Casualty Co. v. North American Capacity Insurance Co.*, 683 F.3d 79 (5th Cir. 2012), in support of its position.

Gray, on the other hand, argues that Indian Harbor "elevates form over substance" and that we should focus on whether the Covenant Not to Execute "provided similar protection as any document entitled 'release' or 'settlement'." Gray further suggests that in light of available excess insurance under Indian Harbor's policy, which would be inaccessible after full release of the Breneks' liability claims against Aggreko, the Covenant Not to Execute was as complete of a release as it could obtain. Additionally, Gray asserts that the policy provision at issue is clear and unambiguous and does not explicitly require a release. In support of its position, Gray relies on another of this court's decisions—*Judwin Properties, Inc. v. United States Fire Insurance Co.*, 973 F.2d 432 (5th Cir. 1992).

Our decisions in *Continental Casualty Co. and Judwin Properties, Inc.* were both decided under Texas law. For the reasons discussed below, we conclude that neither case compels a specific resolution of this matter under Texas law. We address each in turn, starting with the older decision—*Judwin Properties, Inc.* The appellants in *Judwin Properties, Inc.*, to which we will

collectively refer as "Judwin," were sued in multiple personal injury lawsuits by dozens of plaintiffs after treating certain rental properties with the chemical chlordane. 973 F.2d at 433. Prior to trial, Judwin's primary insurer, United States Fire Insurance Company ("USF"), entered into an agreement with two groups of plaintiffs to pay them $6,000,000 in exchange for covenants not to execute judgments directly against Judwin, USF's other insureds, or USF. *Id.* at 433–35. USF also agreed to pay "a peppercorn" to the two groups of plaintiffs in exchange for a release of bad faith claims against USF.[3] *Id.* at 433, 435. Following payment of the $6,000,000, USF declined further coverage under its policy. *Id.* In turn, Judwin sued USF, alleging that the insurer had breached its insurance policy by failing to properly defend Judwin or settle the claims of the two groups of plaintiffs, and asserting claims for bad faith regarding the manner in which USF had defended Judwin. *Id.*

On Judwin's appeal from the district court's grant of summary judgment in favor of USF, we noted that the USF policy provided that USF would "not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability ha[d] been exhausted by payment of judgments or settlements." *Id.* at 436 (internal quotation marks and citation omitted). We found this language to be "plain, clear and unambiguous" and, regarding Judwin's claim that USF had breached its duty to defend, concluded that "USF exhausted its obligation to provide a defense to Judwin when USF paid $6,000,000 to [two groups of] plaintiffs on behalf of the insureds under the policy." *Id.* In response to Judwin's argument that USF's failure to obtain a release of liability from the two groups of plaintiffs prevented termination of USF's obligations under the policy, we pointed out that Judwin had not raised

---

[3] Judwin had separately reached its own agreement with the two groups of plaintiffs whereby such plaintiffs agreed to not execute any judgment against Judwin in exchange for an assignment of any bad faith claims Judwin had against its insurers. *Judwin Props., Inc.*, 973 F.2d at 433.

such argument before the trial court. *Id.* at 436 n.4. We further referenced our policy of not considering arguments raised for the first time on appeal absent a showing of manifest injustice that would result from our failure to consider a purely legal question and noted that Judwin had not demonstrated how our failure to consider its argument would result in manifest injustice. *Id.* Thus, as Indian Harbor correctly points out, we expressly declined in *Judwin Properties, Inc.* to consider the specific issue that is currently directly before us. Accordingly, we do not glean any holding from *Judwin Properties, Inc.* that is binding on us in the instant case.

We turn, then, to *Continental Casualty Co.* to consider what bearing it may have on our decision here. In *Continental Casualty Co.*, we determined that a primary insurer that paid its policy limit to a company that had invoked contractual arbitration against its insured did not exhaust its policy obligations, including its duty to defend, since it failed to obtain a release of any claim against its insured. 683 F.3d at 89–90. Like the insurance policies at issue in *Judwin Properties, Inc.* and here, the policy at issue in *Continental Casualty Co.* provided that the insurer's "right and duty to defend end[ed] when [it] . . . used up the applicable limit of insurance in the payment of judgments or settlements." *Id.* at 89 (internal quotation marks omitted). We agreed with the district court's conclusion that the primary insurer's agreement with the claimant "did not satisfy the plain meaning of this provision because there was no judgment ending even part of the arbitration against [the insured]." *Id.* We added that "there was no settlement as intended by the policy because no lawsuit or dispute was ended." *Id.* Further, we characterized the payment by the primary insurer as an "initial installment payment from one insurer" that was intended to "be applied . . . to some future judgment or global settlement, which did not finally occur until 15 months

13

[later]." *Id.* Thus, we held that the insurer's "payment was . . . not pursuant to a settlement or judgment as required by its policy." *Id.* at 90.

Indian Harbor reads *Continental Casualty Co.* as requiring that an agreement must end a legal claim or lawsuit and, therefore, contain a release of liability, to be considered a settlement. We do not believe that our holding in *Continental Casualty Co.* is as broad as Indian Harbor suggests. Importantly, in that case, we did not take note of *any* benefit obtained by the primary insurer for its insured in exchange for paying its policy limit.[4] *Id.* at 89–90. Absent any perceivable benefit obtained on behalf of the insured, it was clear that the insurer's payment of its limits was not "in the payment of [a] settlement[]." *Id.* at 89. In so holding, we did not exclude the possibility that a payment by a liability insurer in exchange for an agreement by a claimant not to execute any judgment against its insured or some other benefit to the insured could, in some circumstances, constitute a "settlement" under Texas law. This is supported by the language in the opinion stating that "there was no settlement as intended by the policy because no lawsuit or *dispute* ended." *Id.*

b.

Because neither of our decisions relied upon by the parties binds us here, we proceed to conduct an *Erie* analysis of whether, under Texas law, the

---

[4] A review of the district court's opinion and filings in the district court reveals that, as here, the primary insurer in *Continental Casualty Co.* did obtain, as part of its agreement with the tort plaintiff, a confirmation by the tort plaintiff that it would not execute any judgment against the assets of the insured. Unlike here, however, the insured in *Continental Casualty Co.* had previously obtained its own covenant not to execute from the tort plaintiff. *See* 683 F.3d at 83. Perhaps because of that, the panel of this court that decided *Continental Casualty Co.* made no reference to any covenant not to execute obtained by the primary insurer in exchange for the payment of its policy limits. In light of its omission of any reference to the affirmation by the tort plaintiff that it would honor its prior commitment not to execute any judgment directly against the insured in its agreement with the primary insurer, we will not assume that such affirmation played any role in the panel's analysis or decision.

No. 18-40325

Covenant Not to Execute and payment of the remainder of the Gray policy proceeds constitutes a "settlement" sufficient to have relieved Gray of its duty to defend Aggreko under the Gray Policy. *See Martinez*, 935 F.3d at 398.  Our review of pertinent Texas jurisprudence leaves us convinced that, if presented with the issue before us, the Texas Supreme Court would conclude that a settlement occurred, as required by the Gray Policy.

First, to determine whether a settlement took place here, we look to the definition of a settlement.  Relying on Texas jurisprudence, we have previously defined a "settlement" as follows:  "the conclusion of a disputed or unliquidated claim, and attendant differences between the parties, through a contract in which they agree to mutual concessions in order to avoid resolving their controversy through a course of litigation."  *McCleary v. Armstrong World Indus., Inc.*, 913 F.2d 257, 259 (5th Cir. 1990) (quoting *Priem v. Shires*, 697 S.W.2d 860, 863 n.3 (Tex. App.—Austin 1985, no writ)).  There is no dispute that the Covenant Not to Execute is a binding contract.  Further, it is apparent that in that contract, mutual concessions were made:  Gray paid $950,000 on behalf of Aggreko in exchange for the Breneks' agreement not to execute any tort judgment directly against Aggreko.  Though the contract did not end Aggreko's tort liability, it did conclude, as the district court recognized, any claim that the Breneks had to Aggreko's personal assets and eliminated any personal exposure that Aggreko faced with respect to a potential tort judgment against it.  In addition, the Covenant Not to Execute effectively reduced the amount of damages that the Breneks could recover as a result of any finding of tort liability on the part of Aggreko by $950,000, since, in it, the Breneks "acknowledge[d] and agree[d] that Aggreko retain[ed] whatever rights it may have under the law to reduce the amount of any damage award against it by way of settlement credit, proportionate responsibility, Tex. Civ. Prac. & Rem. Code Chapter 33, the One-Satisfaction Rule, or otherwise."

Considering the foregoing, the fact that the Breneks' damages plainly exceed the Gray Policy limit, and the inability of Gray to obtain a full release of Aggreko without hampering the Breneks' excess coverage claims, we believe that the Texas Supreme Court would conclude that a settlement occurred as to the Breneks' claims against Aggreko.

Our conclusion is bolstered by various Texas cases addressing exhaustion of liability policy limits and/or an insurer's duty to defend, including a case relied upon by Gray in its briefing—*Kings Park Apartments, Ltd. v. Nat'l Union Fire Ins. Co.*, 101 S.W.3d 525 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).[5] *Kings Park Apartments, Ltd.* arises from the same factual circumstances as *Judwin Properties, Inc.* Kings Park Apartments, Ltd. ("Kings Park") owned some of the rental properties that were treated with chlordane by Judwin. *Id.* at 528. Shortly before trial, Kings Park and some related parties reached an agreement with one group of plaintiffs, pursuant to which Kings Park assigned its bad faith claims against its insurers to the plaintiffs in exchange for a covenant not to execute any judgment directly against Kings Park. *Id.* Kings Park retained a monetary interest in the outcome of any bad faith lawsuits by the plaintiffs. *Id.* at 529. Following a judgment against Kings Park, certain plaintiffs filed suit against Kings Park's insurers, including National Union, asserting bad faith claims under the assignment by Kings Park. *Id.* National Union later reached an agreement with these plaintiffs in which it agreed to pay its $5 million policy limit and a peppercorn in exchange for a covenant not to execute any judgment against Kings Park and a release of the bad faith claims against National Union. *Id.*

---

[5] We note that while Indian Harbor spends much time in its briefing pointing to cases from other jurisdictions to support its position, it does not point to any case from a Texas court that is directly on point.

Kings Park filed a separate suit against National Union, alleging that National Union had wrongfully paid its policy limit to resolve only the bad faith claims against it, as opposed to the plaintiffs' claims against Kings Park, and that National Union had wrongfully refused to defend or indemnify it. *Id.* at 530. On appeal from a jury verdict in favor of Kings Park, National Union contended that payment of its policy limit was on behalf of its insureds and, therefore, that it had exhausted its obligations under its policy. *Id.* at 530–31. The court of appeals agreed, finding the evidence sufficient to establish that National Union exhausted its policy limit by paying $5 million on behalf of Kings Park to settle bodily injury claims against it and a peppercorn for the release of bad faith claims against National Union. *Id.* at 533–34. The court looked to, *inter alia*, the language of National Union's agreement with the plaintiffs and the reasoning and holding of this court in *Judwin* in support of its conclusion. *Id.* at 532. Notably, the court rejected King Park's argument that, because National Union did not obtain a release of tort liability for Kings Park in exchange for its $5 million payment, the payment could not have exhausted National Union's policy. *Id.* at 532–33. The court noted that the lack of a release of liability was "not dispositive," since the plaintiffs' bodily injury claims against Kings Park were retained for the purpose of preserving their claims against an excess insurer. *Id.* at 532–33.

In response to Kings Park's argument that it received no benefit from National Union's settlement payment, particularly given that it had already entered into its own covenant not to execute with the plaintiffs, the court noted that "Kings Park received the benefit of the right to proceed [against] the next layer of insurance, which would not have been available absent exhaustion of National Union's policy." *Id.* at 534. According to the court, Kings Park also "received the benefit of an essential step toward a full release after all the

insurers paid," since "National Union's $5 million payment was an integral piece of the ultimate settlement plan to a full release of judgment." *Id.*

Here, like the tort defendant in *Kings Park*, Aggreko received the benefit of resolution of a portion of the monetary claim against it and a step toward a full release, since in the Covenant Not to Execute, the Breneks "acknowledge[d] and agree[d] that Aggreko retain[ed] whatever rights it may have under the law to reduce the amount of any damage award against it" because of Gray's payment. Further, here, where Aggreko had not obtained any concessions from the Breneks on its own, Aggreko clearly received as a result of the Covenant Not to Execute the benefit of the Breneks' agreement not to execute any judgment directly against Aggreko. Accordingly, like in *Kings Park*, we conclude that the lack of a release of Aggreko's liability is not dispositive of whether Gray's obligations to Aggreko under the Gray Policy were exhausted.

In further support of our conclusion that Gray exhausted its duty to defend Aggreko under Texas law, we look to *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312 (Tex. 1994), and its progeny. In *Soriano*, the Texas Supreme Court held that "when faced with a settlement demand arising out of multiple claims and inadequate proceeds, an insurer may enter into a reasonable settlement with one of the several claimants even though such settlement exhausts or diminishes the proceeds available to satisfy other claims." 881 S.W.2d at 315. This approach, the court noted, among other benefits, "promotes settlement of lawsuits." *Id.* Relying on *Soriano*, an intermediate Texas court held that an auto liability insurer exhausted its duty to defend its insured by paying its policy limit to enter into *reasonable* settlements of a portion of the claims against him resulting from a three-car accident, where the insurance policy at issue provided that the insurer's "duty to settle or defend end[ed] when [its] limit of liability . . . [had] been exhausted." *See Mid-*

No. 18-40325

*Century Ins. Co. of Texas v. Childs*, 15 S.W.3d 187, 188 (Tex. App.—Texarkana 2000, no pet.).

We recognize that in the instant case, unlike in *Soriano* and *Mid-Century Insurance Co. of Texas*, there are not multiple, independent claimants asserting claims against Aggreko as a result of Brenek's accident. Nevertheless, these cases signify the willingness of Texas courts to allow a liability insurer to *reasonably* exhaust its duties to its insured under the terms of its policy, including its duty to defend, even though it has not resolved all pending liability claims against the insured.  Notably, despite Indian Harbor's suggestion that Gray's agreement with the Breneks was a maneuver to dump Aggreko's defense on it, there is no assertion or indication that payment of $950,000 to the Breneks by Gray on behalf of Aggreko to satisfy a portion of the damages sought for the death of the Breneks' son was unreasonable.  Thus, in light of these cases, we do not see pending liability claims against Aggreko after payment of Gray's policy limit and execution of the Covenant Not to Execute alone as a reason to conclude that Gray did not exhaust its contractual obligations to Aggreko.

Finally, we note that our conclusion that a "settlement" occurred under the terms of the Gray Policy, is, we believe, in line with the Texas Supreme Court's goal of promoting public policies that encourage settlements.  *See Stewart Title Guar. Co. v. Sterling*, 822 S.W. 2d 1, 9 (Tex. 1991).

3.

Having concluded the Texas Supreme Court would likely decide the present issue in favor of Gray, we turn to the likely outcome under Louisiana law.  In its initial brief, Gray asserts that if we "reach [its] conditional cross-appeal, [then we] should reverse the district court's choice-of-law ruling, conclude that Louisiana law applies, and conclude that Gray exhausted its policy limits under Louisiana law and owes no further obligation to Aggreko."

19

Gray does not argue, however, with any detail or clarity why it's duty to defend Aggreko should be considered exhausted under Louisiana law.  Its only discussion of the merits of the issue under Louisiana law contains a brief discussion of the case *Gasquet v. Commercial Union Ins. Co.*, 391 So. 2d. 466 (La. App. 4 Cir. 1980) and its progeny and the suggestion that the law of Louisiana and several other states "aligns with *Judwin*."  Indian Harbor, for its part, does not address in its briefing how the issue before us would be decided under Louisiana law and conceded at oral argument that under Louisiana law Gray likely exhausted its duty to defend Aggreko.

The district court, with little explanation, concluded that "[u]nder Louisiana law, a direct action state, the Covenant Not to Execute acted as a release, as described in *Gasquet v. Commercial Union Insurance Company*, and ended Gray's obligations under the Gray Policy despite not being a full release of liability for Aggreko."

While, as discussed below, we agree that *Gasquet* and its progeny support the conclusion that Gray exhausted its duty to defend Aggreko under Louisiana law, *Gasquet* did not address the specific issue before us.  Further, other sources of Louisiana law are entitled to consideration here.  As discussed above, in making an *Erie* determination under Louisiana law, due to Louisiana's "civilian methodology," we must give primary importance to any pertinent Louisiana constitutional or statutory provisions.  *Jorge-Chavelas*, 917 F.3d at 851.  Louisiana Civil Code article 3071 provides Louisiana's definition of a "settlement," or, using Louisiana's terminology, a "compromise."  Because our task is to determine whether a settlement occurred sufficient to relieve Gray of its duty to defend Aggreko under the Gray policy, that article is pertinent and warrants our primary consideration.  Notably, the district court and the parties failed to give this provision any consideration, much less the primary consideration it deserves.

No. 18-40325

Louisiana Civil Code article 3071 defines a "compromise" as "a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." LA. CIV. CODE ANN. Art. 3071 (2007). For the same reasons that the agreement between Gray and the Breneks appears to meet the Texas definition of a "settlement," it also appears to meet the Louisiana definition of a "compromise." Again, the Covenant Not to Execute is undoubtedly a contract; both Gray, on behalf of Aggreko, and the Breneks made concessions in such contract; and, through the Covenant Not to Execute, the uncertainty as to Aggreko's personal financial obligation to the Brenek's and its liability for at least $950,000 in damages was resolved. Thus, it appears that a settlement or compromise occurred between Gray, on behalf of Aggreko, and the Breneks under the terms of Louisiana Civil Code article 3071.

Having addressed the code provision relevant to this dispute, we turn, now, to *Gasquet* and its progeny. In *Gasquet*, the plaintiff suffered severe injuries in an airboat accident that occurred while he was on a hunting trip. 391 So. 2d at 468. Prior to trial, the plaintiff entered into an agreement with the tort defendants' primary insurer whereby the primary insurer paid $200,000 of its $300,000 liability policy limit in exchange for a complete release of the primary insurer and a release of the alleged tortfeasors "from all claims which might be recovered from [them] directly, but specifically reserving his claims only to the extent that collectible coverage is afforded to [the alleged tortfeasors] by [a] policy of excess insurance." *Id.* at 468, 470. As part of his agreement with the primary insurer, the plaintiff also agreed to "allow a credit to [the excess insurer] for the full $300,000 of the primary insurance policy." *Id.* at 470.

The excess insurer sought summary judgment, claiming that there was no coverage under its policy since the plaintiff settled with the primary insurer

21

for less than its policy limits. *Id.* The excess insurer relied on the following language from its policy in support of its argument: "Liability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence." *Id.* The excess insurer argued that since the limit of the underlying policy had not been paid and no longer could be paid, due to the language of the plaintiff's agreement with the primary insurer, it could not have any liability under its excess policy. *Id.* After studying relevant Louisiana jurisprudence and cases from other jurisdictions, the Louisiana Fourth Circuit Court of Appeal held that the plaintiff's "release of the primary insurer . . . and partial release of [the tortfeasors] for less than the full primary limits, but granting a credit for the full primary limits and reserving the right to proceed against the excess carrier, did not release [the excess carrier] from its liability as the excess insurer." *Id.* at 472.

As recognized in *RSUI Indemity Co. v. American States Insurance Co.*, "*Gasquet*" has become a term of art among Louisiana jurists and lawyers to describe a type of release. 127 F. Supp. 3d 649, 657 (E.D. La. 2015). The court in *RSUI Indemnity Co.* described a *Gasquet* release and its function as follows:

> [B]y executing a *Gasquet* release in a settlement agreement, a plaintiff (1) releases the primary insurer entirely, and (2) releases the insured from all claims which might be recovered from the insured directly, reserving claims against the insured *only* to the extent that *collectible* coverage is afforded by an excess insurance policy. Procedurally, after a *Gasquet* release is executed the insured remains in the lawsuit as a "nominal" defendant while the plaintiff pursues recovery from the excess insurer.

*Id.* at 658 (alterations omitted) (internal quotation marks and citation omitted). *See also Thistlethwaite v. Gonzalez*, 106 So. 3d 238, 244 n.1 (La. App. 5 Cir. 2012) (discussing *Gasquet* and its implications); *Jones v. Capital Enters.,*

*Inc.*, 89 So. 3d 474, 480–81 (La. App. 4 Cir. 2012) (same); *Thompson v. Shay*, 817 So. 2d 1230, 1233 (La. App. 1 Cir. 2002) (same).

As noted above, we believe that *Gasquet* and its progeny do support the conclusion that the Louisiana Supreme Court would conclude that a settlement occurred sufficient to relieve Gray of its duty to defend Aggreko, since these cases make clear that Louisiana courts are willing to recognize that a liability insurer can exhaust its duties to its insured without obtaining a release of tort liability on behalf of the insured. *Gasquet* does not, however, resolve the central issue here: whether a "settlement" can occur under Louisiana law without a release of any claim or tort liability. To the extent the district court's decision suggests that *Gasquet* does resolve that question, it is in error.

The Louisiana Supreme Court case of *Pareti v. Sentry Indemnity Company*, 536 So. 2d 417 (La. 1988), also instructs our resolution of the issue before us under Louisiana law. The issue before the court in that case was "whether [a] liability insurer had a continuing duty, after the exhaustion of its policy limits through settlement, to defend its insured in another claim arising from the same [automobile] accident." *Pareti*, 536 So. 2d at 418. The policy provided that "the insurer's duty to settle or defend end[ed] when [its] limit of liability . . . ha[d] been exhausted." *Id.* The court concluded that because this language is not ambiguous and because "there [was] no indication from the record that the insurer did not act in good faith when it settled the personal injury claim for the limits of its liability policy," the insurer was not obligated to defend its insured as to the unresolved claim after payment of its policy limit. *Id.* at 418–19.

In deciding the case, the court cautioned that its ruling was "premised upon both the language of the policy before [it] and the facts of [the] particular case." *Id.* at 419. Further, it recognized that "[w]hen an insurer merely tenders its limits without obtaining a settlement of any claim for its insured, a

strong argument can be made that it has neither exhausted its policy limits nor fulfilled its fiduciary duty to discharge its policy obligations to the insured in good faith." *Id.* at 422–423 (internal quotation marks and citation omitted). Recognizing and addressing the "[r]isk that insurance companies [would] enter inappropriate settlements in some cases" to avoid their contractual duties to their insureds, including the duty to defend, the court stated that "in every case, the insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good faith." *Id.* at 423. The court added that "[a]n insurer which hastily enters into a questionable settlement simply to avoid further defense obligations under the policy clearly is not acting in good faith and may be held liable for damages caused to its insured." *Id.*

The Louisiana Supreme Court's willingness to recognize that a liability insurer can exhaust its duty to defend under its policy by, in good faith, resolving some, but not all, claims against its insured for its policy limits suggests that it would also recognize the exhaustion of a liability insurer's duty to defend by, in good faith, fully resolving the question of its insured's personal liability for damages.

Considering the foregoing authorities, and for the reasons discussed above, we believe that the Louisiana Supreme Court would determine that Gray, on behalf of Aggreko, and the Breneks entered into a settlement sufficient to exhaust Gray's duty to defend Aggreko under the Gray Policy.

4.

Because we conclude that the outcome of the present dispute would be the same under both Texas and Louisiana law, we need not engage in a conflict-of-laws analysis and apply Texas law. *See Mumblow*, 401 F.3d at 620. Under Texas law, as set forth above, we conclude that Gray exhausted its policy limit and its duty to defend Aggreko when it paid $950,000—the remainder of its liability coverage limit—to the Breneks in exchange for the Breneks agreement

not to execute any judgment against Aggreko and to recognize Aggreko's entitlement to claim a $950,000 damages credit.

We emphasize that our resolution of the matter before us does not reach and should not be interpreted as in any way construing Indian Harbor's obligations under its own policy, which concerns matters that are not before us. Further, we recognize that, in some instances, insurers may be compelled to improperly and hastily hand over their policy limits to rid themselves of the duty to defend their insured. We reiterate that such a situation is not before us, as there is no suggestion or indication in the record that the Breneks' damages do not exceed the Gray policy limit or that Gray did not properly investigate the Breneks' claim on behalf of Aggreko. Thus, our decision should not be construed as in any way limiting remedies to insureds under Texas or Louisiana law against insurers who have improperly or in bad faith handled their claims.

## IV.

For the reasons set forth herein, the judgment of the district court is AFFIRMED.