# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 13, 2021

Lyle W. Cayce
Clerk

No. 20-20507

Beatrice Stewart,

*Plaintiff—Appellant*,

*versus*

Metropolitan Lloyds Insurance Company of Texas,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-5008

Before Jones, Costa, and Duncan, *Circuit Judges*.

Per Curiam:*

Beatrice Stewart filed an insurance claim after observing damage to her walls and floors. She says that her policy covers this damage; her insurer disagrees. To determine who is right, we must decide whether Stewart experienced an "entire collapse" of part of her home.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-20507

I.

One evening in late 2017 or early 2018, Stewart was awakened by "a loud bang" that shook her house, as if "a bomb had gone off in the neighborhood." The next morning, she noticed the damage to her home: cracked sheetrock and sunken floors. A few days later, she cut a hole through her floor and discovered that a couple of joists below her subfloor had broken and fallen away. After performing some short-term repairs, Stewart filed a claim with her home insurer Metropolitan Lloyds Insurance Company of Texas.

Both Stewart and Metropolitan engaged experts to review the damage. Metropolitan hired Donan Engineering, which found "broken and deteriorated floor joists, deteriorated floor decking, walls not plumb, and gaps in the wall-to-ceiling interface." By the time of the inspection, Stewart had already "removed and replaced the soft subfloor decking and reinforced the floor joist." The Donan report also described "insect tunnels in the subfloor decking and floor joists," as well as "no vapor barrier above the soil under the house."[1] It concluded that "rot [in the] floor joists and subfloor decking [were] caused by a combination of termite damage and exposure to moisture over the lifespan of the structure," resulting in the broken floor joists and unlevel floor. Stewart's own expert, Pfister Pier & Beam Leveling, agreed with Donan that "termite damage and wood rot was the cause of the foundation collapse/failure."

---

[1] Vapor barriers are meant to prevent the build-up of moisture inside floors and walls, which can damage a home's structure. *See Moisture Control: Utilizing Vapor Retarders*, N. Am. Insulation Mfg. Ass'n, https://insulationinstitute.org/im-a-building-or-facility-professional/residential/installation-guidance-2/moisture-management/vapor-retarders/ (last visited May 7, 2021).

No. 20-20507

The inspectors took numerous photos that are part of the record. We use just one (which includes markings made by Donan Engineering) to give a sense of the damage:



Metropolitan denied Stewart's claim, determining based on the Donan report that her policy did not cover the damage. Stewart then sued for breach of contract in Texas state court. She also brought several other claims: breach of the duty of good faith and fair dealing, state insurance code violations, and violations of the Texas Deceptive Trade Practices and Consumer Protection Act.

Metropolitan removed the case to federal court and moved for summary judgment on all claims. Stewart sought partial summary judgment on her breach of contract claim. The district court concluded that Stewart's policy did not cover the damage because she did not experience a collapse at all, much less an "entire collapse," as the policy required. And because Stewart's bad-faith and statutory claims could not go forward "without

coverage or a contract breach," the district court granted Metropolitan's motion and dismissed the case with prejudice.

## II.

This court reviews the district court's grant of summary judgment de novo. *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 856 (5th Cir. 2014). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

## A.

Texas law governs this insurance dispute. *See Lawyers Title Ins.*, 739 F.3d at 856. Under Texas law, insurance contracts are subject to "the same rules of construction that apply to contracts generally." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008). The policy's "words and phrases . . . should be given their plain and ordinary meaning." *Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 688 (5th Cir. 2019). "An interpretation that gives each word meaning is preferable to one that renders one surplusage." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23–24 (Tex. 2015). If a contract is unambiguous, it will be enforced as written. *Don's Bldg. Supply*, 267 S.W.3d at 23. A contract is not ambiguous, though, just because the parties disagree about the scope of its coverage. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 842 (5th Cir. 2012). Only when "a contract is susceptible to more than one reasonable interpretation" must the court "resolve any ambiguity in favor of coverage." *Don's Bldg. Supply*, 267 S.W.3d at 23. As the insured, Stewart bears the initial burden of proving that her policy covers the damage. *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998).

No. 20-20507

The dispute hinges on whether Stewart's losses fall under the policy's provision covering damage involving an "entire collapse." The policy defines collapse as "an abrupt falling down or caving in of a building or any part of a building." This definition excludes "settling, cracking, sagging, bowing, bending, leaning, shrinking, bulging, or expansion" as well as the mere "danger of falling down or caving in."

Stewart's policy does not, however, cover every collapse. Metropolitan "will pay for sudden and accidental direct physical loss to covered property involving the entire collapse of a building or any part of a building caused only by one or more" specified causes, which include "hidden decay of the structure" and "hidden insect or hidden vermin damage."[2] No other damage resulting from collapse is covered. Additionally, "[l]oss to . . . foundation" is excluded from coverage "unless the loss is a direct result of the collapse of a building."

In sum, Stewart's losses are only covered if (1) they involved an "entire collapse" of all or part of a building, (2) that collapse was solely caused by an enumerated peril such as hidden structural decay or insect damage, and (3) any damage to Stewart's foundation was directly attributable to "the collapse of a building." Unfortunately for Stewart, she cannot meet her burden under the first requirement because no "entire collapse" occurred.

B.

While Stewart's policy defines "collapse," it does not separately explain what it means by "*entire* collapse." The word "entire," however, should not be read out of Stewart's policy. *See U.S. Metals*, 490 S.W.3d at

---

[2] The collapse provisions are central to this case because Stewart's policy otherwise excludes coverage for damage caused by "wear and tear" or "insects."

23–24 (expressing preference against surplusage). It should instead be given effect according to its plain meaning. *Aggreko*, 942 F.3d at 688.

"Entire" means "with no element or part excepted" or "complete in degree." *Entire*, Webster's Third New International Dictionary (2002); *see also Entire*, Black's Law Dictionary (9th ed. 2009) ("Whole; complete in all its parts."). Courts from California to Connecticut interpreting similar insurance provisions have therefore held that an "entire collapse" unambiguously refers to a collapse that is total or complete. *See, e.g.*, *Jordan v. Allstate Ins. Co.*, 11 Cal. Rptr. 3d 169, 181 (Ct. App. 2004) ("For a building or a portion thereof to sustain an 'entire collapse' must mean that it has *entirely* collapsed, that is 'wholly,' 'completely,' or 'fully.'" (citing *Entirely*, Webster's Third New International Dictionary (1966)); *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 379 (D. Conn. 2017) (same).

Whether a structure has "entirely" collapsed depends on the extent to which it has fallen down or caved in. A structure merely in danger of future collapse has not yet fallen down or caved in at all, so it has not suffered an entire collapse. *Jordan*, 11 Cal. Rptr. 3d at 181 ("It seems self-evident that the policy's use of the term 'entire' collapse necessarily must refer to an actual, not an imminent collapse."); *Agosti*, 279 F. Supp. 3d at 378–79 ("[T]he gradual deterioration of the basement walls cannot yet be characterized as an 'entire collapse.'"). An entire collapse must also go beyond the deterioration of just one small piece of a larger structural component. *See Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Co.*, 670 F. Supp. 2d 1156, 1161–64 (D. Or. 2009) (holding that decay of "stud ends [or] four-by-four bottom plates" did not amount to "the collapse of an entire structural member"). A contrary interpretation "would render the term 'entire' meaningless." *Id.* at 1164.

The damage Stewart describes does not rise to level of an entire collapse. She contends that part of her home entirely collapsed because the floor "caved in." She points to her testimony that in the days after hearing a loud bang, she found that her floors were sunken, joists beneath her subfloor had broken and fallen away, and the frame underneath her home sat several feet lower than before. But the undisputed evidence shows that the floor did not entirely cave in. While the floor was "unlevel," Stewart continued to live in her house and walk its hallways after the damage occurred. As the district court noted, there was "no hole or gap in the floor" until Stewart cut into it herself. Though the floor sagged, "sagging" is one of those gerunds excluded from her policy's definition of collapse.

Stewart relies on an Illinois state court decision to support her argument that she experienced a covered collapse. In *Gulino v. Economy Fire & Casualty Co.*, a portion of the insured's basement ceiling sagged eight inches, disabling the heating system and damaging pipes. 971 N.E.2d 522, 525–28 (Ill. Ct. App. 2012). Much like Stewart's policy, the insurance agreement in *Gulino* covered "the entire collapse of a building or any part of a building," defining "collapse" as "an abrupt falling down or caving in of a building or part of a building," and excluding "settling, cracking, sagging, [and] bowing," among other things. *Id.* at 524. Still, the *Gulino* court found that "a portion of the basement ceiling did cave in," providing the insured with coverage even though "the facts undeniably show[ed] that [his] house or any part of it had not completely fallen down." *Id.* at 528. But the *Gulino* court never analyzed whether an *entire* collapse occurred; it instead leapt from the determination that the insured experienced a cave-in to the

conclusion that there was a covered collapse.[3]  We are not, therefore, convinced that *Gulino* sheds light on how this court must interpret the "entire collapse" language of Stewart's policy.

The conclusion that Stewart urges us to draw from *Gulino* fares no better.  She argues that her policy covers her damage even though there was "something less than a complete falling down" because it involved the undermining of her home's structure.  *Gulino*, 971 N.E.2d at 528.  This reading of her policy, however, overlooks the word "entire."  When the word "entire" is missing from an insurance agreement, courts may find coverage for only partial collapses because the policy is "not written in terms of how far a building must fall down or to what degree a building must cave in to constitute collapse."  *See, e.g.*, *Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1196 (D. Or. 2009).  Here, by contrast, the extent to which part of Stewart's home has fallen down (or caved in) is the whole ball game— it must have suffered an *entire* collapse.  "Something less than a complete falling down" is not enough.

## III.

Because Stewart's breach of contract claim fails, her allegations of bad-faith and statutory violations based on the coverage denial cannot go forward.  *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 490 (Tex. 2018) ("[T]here can be no claim for bad faith denial of an insured's claim for policy benefits when an insurer has promptly denied a claim that is in fact not covered." (cleaned up)); *id*. at 490–91 (same for statutory claims arising out of the denial of coverage); *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532

---

[3] The decision also failed to explain why damage it repeatedly described as "sagging" warranted coverage despite the explicit exclusion of "sagging" from the definition of collapse.  *See Gulino*, 971 N.E. 2d at 532 (Quinn, P.J., dissenting).

No. 20-20507

(Tex. 2010) ("When the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive.").

***

As the district court recognized, Stewart "has conscientiously obtained and maintained [her] policy and there is damage that must be repaired at considerable cost." But her policy is inflexible. To recover, Stewart must show that part of her home wholly, completely, or totally collapsed. She has not done so.

The judgment of the district court is therefore AFFIRMED.